UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert Beam RUNYAN, Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Robert Beam Runyan, Defendant–Appellant.

Nos. 00–10821, 01–11207.

United States Court of Appeals,
Fifth Circuit.

Dec. 10, 2001.

---

Chad Eugene Meacham (argued), Dallas, TX, for Plaintiff-Appellee.

J.W. Johnson, Johnson Law Office, San Angelo, TX, Terri Raye Zimmermann Jacobs (argued), Jack B. Zimmermann, Zimmermann & Lavine, Houston, TX, for Defendant-Appellant.

Before KING, Chief Judge, and JOLLY and BENAVIDES, Circuit Judges.

KING, Chief Judge:

Defendant-Appellant Robert Beam Runyan was convicted of sexual exploitation of children in violation of 18 U.S.C. § 2251 and of distribution, receipt, and possession of child pornography in violation of 18 U.S.C. § 2252A. In two separate actions, Runyan appeals his conviction (No. 00–10821) and the district court's denial of his post-trial motion for a new trial (No. 01–11207). On September 24, 2001, we consolidated these two cases for the purposes of appeal. In challenging his conviction, Runyan asserts (among other claims) that the district court erred in admitting evidence obtained pursuant to an unlawful pre-warrant search by law enforcement officials. We hold that portions of the pre-warrant search violated the Fourth Amendment. Accordingly, we REMAND No. 00–10821 to the district court for further findings of fact addressing whether the search warrants would have been sought and issued in the absence of the Fourth Amendment violation. We do not reach any of the other issues raised in No. 00–10821 or any of the issues raised in No. 01–11207 at this time.

## I. Factual and Procedural Background

Defendant Robert Runyan lived on a ranch outside Santa Anna, Texas, where he owned and operated Gammon Technologies, a computer repair and service company, from 1990 to 1998. During this time period, Runyan employed a number of local junior high and high school students to perform odd jobs at the ranch and to perform administrative tasks for Gammon Technologies.

Runyan was married to Judith Runyan ("Judith"), who has a daughter, Rickie, from a previous relationship. In January 1999, Judith left Runyan and moved in with a boyfriend in Brownwood. Runyan subsequently filed for divorce.

In June 1999, Judith made several trips to the ranch to retrieve items that she contends were her personal property. She

was accompanied at different times by Rickie and other friends. Judith was aware that Runyan was not present at the ranch at these times. She was not aware that after their separation, Runyan had secured the gated entrance to the ranch with a chain and lock. Runyan had also changed the locks on the house and the barn and installed surveillance cameras on the property.

On June 17, Judith and Rickie climbed over the fence surrounding the ranch, looked through a window of the ranch house, and saw that Judith's belongings were inside. On June 18, Judith, Rickie, and a friend, Casey Giles, returned to the ranch house (again by climbing the fence surrounding the ranch) and entered the house through a breakfast-room window. After searching through the house for Judith's belongings, they entered the barn next to the house, also by climbing through a window. In the barn, Giles opened a black duffel bag and discovered that it contained pornography, compact disks ("CDs") and computer disks, a Polaroid camera with film, a vibrator, and Polaroid pictures of two individuals, one of whom appeared to be a very young teenager. Under the black bag were two waterproof ammunition boxes containing more pornography. Judith took the black bag back to her Brownwood residence.

Later that day, Judith and six of her friends reentered Runyan's ranch, this time by cutting the chain on the gate with bolt cutters. For the remainder of the day on June 18 and throughout the day on June 19 they removed items identified by Judith as belonging to her. During their search of the ranch house they found a desktop computer that Judith claimed was

hers, surrounded by 3.5 inch floppy disks, CDs, and ZIP disks.[1] Judith asked one of her friends, Brandie Epp ("Brandie"), to dismantle the desktop computer and to take it to Judith's Brownwood residence and reassemble it there. In addition to the computer, Brandie took the disks that were lying on the floor surrounding the computer. After reassembling the computer, Brandie viewed approximately twenty of the CDs and floppy disks that had been removed from the ranch and found that they contained images of child pornography. Brandie did not view any of the images on the ZIP disks because the necessary hardware was not connected. After viewing the images, Brandie contacted the sheriff's department. A deputy subsequently arrived, and Brandie turned over twenty-two CDs, ten ZIP disks, and eleven floppy disks to the deputy.

Over the next few weeks, Judith turned over various items found at the Runyan ranch to different law enforcement agencies. She provided the sheriff's department with additional CDs of child pornography and she gave the Santa Anna Chief of Police a 3.5 inch diskette containing child pornography. Judith also called Texas Ranger Bobby Grubbs ("Ranger Grubbs") and turned over to him the black duffel bag and pornographic materials removed from the ammunition boxes in Runyan's barn. At subsequent meetings with Ranger Grubbs on June 28 and July 7, Judith provided him with two additional disks and with Polaroid photographs that she had removed from the ranch. At some point during this time period, Judith also turned over the desktop computer to Ranger Grubbs.[2]

---

**1.** This opinion will refer to the 3.5 inch floppy disks, the compact disks, and the ZIP disks collectively as "the disks."

**2.** It is unclear from the record when this transfer took place.

Ranger Grubbs viewed some of the disks delivered by Judith on his computer. He observed images of child pornography. On June 24, 1999, the Coleman County District Attorney went to the Sheriff's office and viewed several images as well. At this time, several of the images were printed out on a color printer and shown to members of the District Attorney's staff. An investigator in the District Attorney's office, Darla Tibbetts, tentatively identified the subject photographed in one of the images. An intern working for the District Attorney's office, Melissa Payne, was then brought to the sheriff's office to assist with the identification. She positively identified the girl in the pictures as Misty Metcalf ("Misty"), a former high school classmate.[3]

On June 28, 1999, upon learning that he was a potential suspect, Runyan went to meet with Ranger Grubbs. At this meeting, after he had been given *Miranda* warnings, Runyan stated that he found a bag of pornography at a rest stop. Runyan stated further that the bag contained CDs and other items, including a vibrator. He admitted that he viewed the materials in the bag and that, out of curiosity, he used his computer to view child pornography available on the Internet.[4]

On July 7, 1999, Customs Service Special Agent Rick Nuckles ("Agent Nuckles") became involved in the investigation. While at the District Attorney's office on an unrelated matter, Agent Nuckles observed agents involved in the Runyan investigation viewing images of child pornography and stated his willingness to work on the case. He was provided with all of the investigative reports, statements, and physical evidence that Judith had turned over, including the desktop computer and the disks. Agent Nuckles then performed an analysis on every piece of evidence he had received, copying the materials onto blank CDs. He examined several images from each disk and CD, including the ZIP disks. Agent Nuckles found two images of Misty, apparently taken with a digital camera or taken with a Polaroid camera and then scanned into a computer.

Also on July 7, Tibbetts and Ranger Grubbs interviewed a number of local young people, including Misty. Misty stated that Runyan hired her when she was a young teenager to perform odd jobs around his ranch and to iron clothes for him. She said that he approached her when she was fifteen about posing for nude photographs. Misty told Tibbetts that Runyan had taken sexually explicit photographs of her on numerous occasions when she was between the ages of fifteen and seventeen. She reported that Runyan had sometimes paid her approximately five dollars per photographic session and that he had promised her more money once he sold the pictures over the Internet to customers in Japan.

Agent Nuckles then filed two applications for federal search warrants, supported by his own affidavits. The first application sought a warrant to search the desktop computer and all the disks for files containing illicit images. The second application sought a warrant to search Runyan's ranch house for any and all computers, computer hardware, software, and devices. The affidavits supporting these applications included statements made by Misty and Judith to Ranger Grubbs as well as information from Runyan's volun-

---

**3.** There is conflicting testimony in the record regarding whether Payne was shown Polaroid photographs or computer printouts of Misty.

**4.** However, Runyan maintains that he never uploaded or downloaded any images containing child pornography from the Internet at these times.

tary statement to Ranger Grubbs. In addition, one of the affidavits also contained a statement indicating that Ranger Grubbs had conducted a "cursory" review of the computer storage media. A magistrate judge issued both warrants, and the search of Runyan's ranch house resulted in the discovery of a computer backup tape that contained one picture of child pornography.

On October 13, 1999, Runyan was indicted on six counts of child pornography charges. Runyan filed three separate motions to suppress the evidence against him, primarily contending that the pre-warrant searches of the disks conducted by the various law enforcement officials involved in the investigation violated his Fourth Amendment rights. Consequently, Runyan argued, any evidence directly or indirectly obtained from these unlawful searches should be suppressed.

The trial court held a hearing on Runyan's motions to suppress on April 20, 2000. At the close of the hearing, the trial court denied the motions, finding that the pre-warrant police searches did not violate Runyan's Fourth Amendment rights because the police did not exceed the scope of the private search conducted by Judith and her companions. The trial court further found that the affidavits were sufficient to show probable cause to search both the disks and Runyan's residence and that the affidavits did not contain any material misrepresentations, omissions, or stale information that would negate the magistrate judge's finding of probable cause.

At trial, Runyan's primary defense strategy was to discredit Misty and to suggest to the jury that it was Misty, not Runyan, who owned the child pornography that was found on the ranch. Runyan also suggested to the jury that it was Misty's boyfriend, Nathan Wood ("Nathan"), not Runyan, who had taken the nude photographs of her at Runyan's ranch and at Runyan's office in town while Runyan was traveling for extended periods.

On April 21, 2000, a jury convicted Runyan of four counts:[5] Count 1—sexual exploitation of children in violation of 18 U.S.C. § 2251; Count 3—distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2); Count 4—receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2); and Count 5—possession of child pornography in violation of § 2252A(a)(5)(B). On July 28, 2000, the district court sentenced Runyan to 240 months on Count 1; 60 months on Count 3, to be served consecutively to Count 1; and 180 months on Counts 4 and 5, to run concurrently with the sentence imposed on Count 1, for a total imprisonment of 300 months. In addition, the district court imposed a three-year term of supervised release and mandatory special assessments totaling $400.

Runyan timely appealed his convictions and his sentence, contending that: (1) the trial court erred in failing to suppress the evidence obtained directly and indirectly from the pre-warrant police searches; (2) there was insufficient evidence introduced at trial to support the interstate commerce element of each of the four charges; (3) the trial court erred in refusing to order the government to produce Nathan's computer and in refusing to conduct an *in camera* review of evidence on Nathan's computer that Runyan contends was exculpatory; (4) the trial court erred in admitting evidence that Runyan refused to consent to the search of the desktop computer; and (5) the trial court erred in not grouping all the counts of his conviction in

5. Two counts were dismissed prior to trial.

the sentencing determination.[6] While that appeal was pending before this court, Runyan filed a motion for new trial based on newly discovered evidence in the district court, alleging that Nathan's computer contained exculpatory evidence that the government withheld prior to trial. The district court denied this motion on September 7, 2001, and Runyan timely appealed to this court. We consolidated Runyan's two actions for the purposes of appeal on September 24, 2001. Because we find that a limited remand to the district court is necessary to resolve one of Runyan's Fourth Amendment claims, we do not reach any of his other claims at this time.

## II. Runyan's Fourth Amendment Claims

Runyan argues that the trial court erred in refusing to suppress evidence against him that was obtained in violation of the Fourth Amendment. He seeks to suppress two categories of evidence: (1) evidence obtained as a result of pre-warrant searches by state and federal law enforcement officials; and (2) evidence obtained pursuant to the search warrants, which were based on the evidence in category one.[7] Runyan argues that state and federal officials' warrantless examination of the tangible materials (including the disks) turned over by Judith was a "search" that violated the Fourth Amendment. According to Runyan, any information that the police[8] obtained as a result of that examination—including testimony of any witnesses identified through the tangible materials—is the "fruit of the poisonous tree" and should be suppressed.

Runyan further argues that the magistrate judge would not have issued the warrant permitting customs officials to search his ranch and his computers if Agent Nuckles's affidavit had not contained testimony and evidence that originated in the allegedly unlawful pre-warrant searches. Thus, according to Runyan, evidence seized pursuant to the warrant is also "tainted" by the pre-warrant Fourth Amendment violations and should be suppressed.

 "In reviewing the denial of a motion to suppress evidence under the Fourth Amendment, we review the district court's factual findings for clear error and its conclusions regarding the constitutionality of a warrantless search *de novo*." *United States v. Vega*, 221 F.3d 789, 795 (5th Cir.2000) (internal quotations omitted). We view the facts underlying the suppression determination in the light most favorable to the prevailing party, which in this case is the government. *United States v. Howard*, 106 F.3d 70, 73 (5th Cir.1997). It is the defendant's burden to prove a Fourth Amendment violation by a preponderance of the evidence. *United States v. Riazco*, 91 F.3d 752, 754 (5th Cir.1996). Once the defendant proves a Fourth Amendment violation, the burden shifts to the government to demonstrate why the exclusionary rule should not apply to the fruits of the illegal search or seizure. *United States v. Houltin*, 566 F.2d 1027, 1031 (5th Cir.1978).

### The Pre–Warrant Investigation

 The Fourth Amendment protects the "right of the people to be secure in

---

6. The government concedes that Runyan was incorrectly sentenced when the trial court did not group the counts of his conviction.

7. We address only the first of these claims in this opinion.

8. We use the term "police" generically to refer to all of the state and federal law enforcement officials involved in this case.

their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment proscribes only governmental action—it is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official.'" *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)). Runyan makes no attempt to demonstrate that Judith and her companions were acting under the color of government authority when they searched the ranch and the computer storage materials. Runyan's contention is that the police's subsequent review of the materials removed from the ranch was a "search" under the Fourth Amendment.

### 1. Was there a "search?"

■ In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court established that a "search" occurs for Fourth Amendment purposes when the government violates a subjective expectation of privacy that society considers objectively reasonable.[9] *See id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring); *see also California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (adopting the test proposed in Harlan's *Katz* concurrence); *Kyllo*, 121

S.Ct. at 2042–43 (recognizing the continuing vitality of the *Katz* inquiry).

This court has elaborated on the factors relevant to a *Katz* inquiry. In *United States v. Cardoza–Hinojosa*, 140 F.3d 610, 615 (5th Cir.1998), we indicated that whether an interest is protected by the Fourth Amendment depends on five factors: (1) "whether the defendant has a [property or] possessory· interest in the thing seized or the place searched," (2) "whether he has the right to exclude others from that place," (3) "whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion," (4) "whether he took normal precautions to maintain privacy," and (5) "whether he was legitimately on the premises." *Id.* (quoting *United States v. Ibarra*, 948 F.2d 903, 906 (5th Cir.1991)).

■ We recently indicated in *Kee v. City of Rowlett, Texas*, 247 F.3d 206 (5th Cir.2001), that the *Cardoza–Hinojosa* factors, "while appropriate to determine the expectation of privacy in the context of searches of physical real property," cannot necessarily be applied to other types of searches without modification. *Id.* at 212–13. In *Kee*—which involved a search conducted via an electronic listening device— we determined that it was appropriate to analyze only the two *Cardoza–Hinojosa* factors most applicable to electronic surveillance (i.e., whether the defendant had a subjective expectation of privacy in his conversations and whether he took normal precautions to maintain this privacy). *See id.* at 213. Similarly, in the instant case— which involves a search of personal property rather than real property—we find that

9. The *Katz* inquiry has traditionally been conceptualized as a two-part test, instructing courts to determine (1) whether the individual challenging the investigative activity had a subjective expectation of privacy and (2) whether society was prepared to recognize that expectation of privacy as objectively reasonable. However, many modern courts, including the Supreme Court in its most recent discussion of *Katz*, have collapsed this two-part test into a single inquiry. *See Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 2042–43, 150 L.Ed.2d 94 (2001).

the first, third, and fourth *Cardoza–Hinojosa* factors are most directly applicable and should be dispositive. Thus, we analyze whether Runyan had a possessory interest in the personal property searched, whether he exhibited a subjective expectation of privacy in that personal property, and whether he took normal precautions to maintain that expectation of privacy.

■ The parties do not dispute that Runyan had a possessory interest in the materials searched. While the record contains some disputed testimony regarding whether Judith or Runyan was the owner of the desktop computer, neither party contests that Runyan was the sole owner of both the storage containers retrieved from the barn and the disks found near the desktop computer in the office, which were the subjects of the pre-warrant search at issue.

In addition, Runyan clearly exhibited a subjective expectation of privacy in both sets of materials in question. Runyan's placement of the non-electronic pornography in the duffel bag and the waterproof ammunition storage containers found in the barn evidences his subjective expectation of privacy in those materials. *See United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir.1992) ("Individuals can manifest legitimate expectations of privacy by placing items in closed, opaque containers that conceal their contents from plain view."). The government concedes that the disks found in the office near the computer are "containers" and that the standards governing closed container searches are applicable. Because neither party contests this point, we assume without deciding that computer disks are "containers." Accordingly, Runyan appears to have manifested his subjective expectation of privacy in the electronic images in question by storing the images in these "containers." *Cf. United States v. Barth*, 26 F.Supp.2d

929, 936–37 (W.D. Tex.1998) (finding that the owner of a computer manifested a reasonable expectation of privacy in the contents of data files by storing them on a computer hard drive); *United States v. Chan*, 830 F.Supp. 531, 534 (N.D.Cal.1993) (analogizing data in a pager to contents of a closed container).

Finally, the record indicates that Runyan took normal precautions to maintain his privacy with respect to these materials. Runyan's efforts to secure the barn against intrusion by locking the barn door, putting a chain on the gate to the ranch, and installing video surveillance equipment at the ranch certainly qualify as normal precautions to maintain privacy. *See Vega*, 221 F.3d at 796 (indicating that relevant factors when evaluating "normal precautions to maintain privacy" include whether the searched area is fenced or railed, whether the searched area was locked, and whether strangers were invited into the searched area).

■ Because application of the relevant *Cardoza–Hinojosa* factors indicates that Runyan had a protectable privacy interest in the materials that were the subject of the pre-warrant police examinations, those examinations are a series of "searches" within the meaning of the Fourth Amendment. However, this court has recognized that "a police view subsequent to a search conducted by private citizens does not constitute a 'search' within the meaning of the Fourth Amendment so long as the view is confined to the scope and product of the initial search." *United States v. Bomengo*, 580 F.2d 173, 175 (5th Cir.1978); *see also United States v. Paige*, 136 F.3d 1012, 1019 (5th Cir.1998). The government contends that the pre-warrant examinations at issue in the instant case were not "searches" because this "private search" doctrine applies.

The Supreme Court articulated the private search doctrine in *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), and *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In *Walter*, packages containing pornographic filmstrips were delivered to the wrong company. Employees of the company that erroneously received the shipment opened the packages and found film canisters. The content of each film was described on the exterior of its canister. The employees opened the canisters and one employee attempted to hold the films up to the light, but was unable to observe anything about the content of the films in this manner. *Walter*, 447 U.S. at 651, 100 S.Ct. 2395. The recipients then contacted federal agents, who viewed the films with a film projector without obtaining a warrant to search the contents of the packages. The sender was indicted on obscenity charges and filed a motion to suppress the films, arguing that the police had conducted a warrantless search of the package and that the exclusionary rule was therefore applicable. *Id.* at 652, 100 S.Ct. 2395.

In upholding that claim, the Supreme Court produced no majority opinion.[10] The opinion announcing the judgment of the Court, authored by Justice Stevens and joined by Justice Stewart, held that the Fourth Amendment's protections apply to a government search conducted subsequent to a private search to the extent that the government's inquiry is more intrusive or extensive than the private search. *Id.*

at 657, 100 S.Ct. 2395. Prior to their projection of the films, the officers could only draw inferences regarding the content of the films based on the exterior descriptions. The opinion reasons that the official search significantly expanded on the private search by confirming the actual content of the films. *Id.* Put another way, when the private party unwrapped the containers to reveal the labels on the canisters, the sender's expectation of privacy was frustrated in part, but not eliminated altogether. *Id.* at 659, 100 S.Ct. 2395. The subsequent police determination of the content of the films was a warrantless "search" within the meaning of the Fourth Amendment because it breached the remaining, unfrustrated portion of the sender's expectation of privacy.

In *Jacobsen*, the Court confirmed the rationale of Justice Stevens's opinion in *Walter* and elaborated on what it means to "exceed the scope" of a private search. In that case, a Federal Express employee opened a damaged package and found several plastic bags of white powder inside a closed tube wrapped in crumpled newspaper. The employee put the bags back in the tube, put the tube and the newspapers back in the box, and then summoned federal authorities. The agent who responded to the employee's call opened the box, unpacked the bags of white powder and performed a chemical field test confirming that the white powder was cocaine. *Jacobsen*, 466 U.S. at 111–12, 104 S.Ct. 1652. The addressees were subsequently convict-

10. Justices Stevens and Stewart found that the officers had violated the Fourth Amendment because they exceeded the scope of the private search. Justices White and Brennan found that a Fourth Amendment violation had occurred regardless of whether the official search exceeded the scope of the private search. Justice Marshall completed the five justice majority in favor of suppression by concurring in the judgment while joining nei-

ther opinion. The four dissenters found that there was no legitimate expectation of privacy remaining in a package released to a common carrier when the addressee and the intended recipient were both using fictitious names and a private search had "clearly revealed the nature of the[] contents" of the package. *Walter*, 447 U.S. at 663, 100 S.Ct. 2395 (Blackmun, J. dissenting).

ed of possession of an illegal substance with intent to distribute. They argued that the results of the agent's warrantless search were subject to suppression. *Id.* at 112, 104 S.Ct. 1652.

Adopting Justice Stevens's reasoning from *Walter* that "additional invasions of . . . privacy by the Government agent must be tested by the degree to which they exceed the scope of the private search," the Court found that the agent's actions did not violate the Fourth Amendment. *Id.* at 115, 104 S.Ct. 1652. The Court determined that the agent's actions in removing the plastic bags from the tube and visually inspecting their content "enabled the agent to learn nothing that had not previously been learned during the private search." *Id.* at 120, 104 S.Ct. 1652. The Court noted that "[t]he advantage the Government gained thereby was merely avoiding the risk of a flaw in the employees' recollection," and concluded that this confirmatory examination could not violate the Fourth Amendment because "[p]rotecting against the risk of misdescription hardly advances any legitimate privacy interest." *Id.* at 119, 104 S.Ct. 1652.

In *Jacobsen,* the Court further noted that the field test performed by the agent could disclose only one fact previously unknown to the agent—whether or not the white powder was cocaine. The Court found that a chemical test that "merely discloses whether or not a particular substance is cocaine" does not compromise any legitimate interest in privacy. *Id.* at 123, 104 S.Ct. 1652. Because Congress has decided that the interest in privately possessing cocaine is illegitimate, the Court reasoned that "governmental con-

duct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." *Id.* The Court thus concluded that neither the visual inspection nor the field test could be a "search," because neither action infringed "any constitutionally protected privacy interest that had not already been frustrated as the result of private conduct." *Id.* at 126, 104 S.Ct. 1652.

Runyan argues that the private search doctrine is inapplicable in the instant case because the police exceeded the scope of the private search. He maintains that the police's pre-warrant search of the disks exceeded the scope of the review conducted by Judith and Brandie in a number of ways.

First, Runyan notes that the police officers who examined the materials turned over by Judith looked at a greater number of disks than Judith and Brandie did. Judith and Brandie examined only a randomly selected assortment of the floppy disks and CDs that they removed from the ranch, and they did not examine any of the ZIP disks. Agent Nuckles testified at the suppression hearing that he examined every one of the floppy disks, ZIP disks, and CDs that Judith turned over. In addition, Runyan argues that Agent Nuckles examined more images in reviewing each of these disks than did the private searchers.[11] Runyan further points out that, unlike the private searchers, the law enforcement officers printed out selected images and showed them to employees in the District Attorney's office in an attempt to identify an individual in one of the images.

---

11. It is unclear from the record whether the selected images from the disks that were introduced at trial were viewed by both the private searchers and the police searchers or whether these images were exclusively the product of the police's more expanded search. At least one ZIP disk was introduced at trial that the private searchers clearly could not have examined because they lacked the appropriate hardware.

While each of the distinctions between the private search and the police search pointed out by Runyan is supported by the record, it is unclear from this court's jurisprudence which of these distinctions are constitutionally relevant. Indeed, there is a remarkable dearth of federal jurisprudence elaborating on what types of investigative actions constitute "exceeding the scope" of a private search.[12]

■ Language from the Supreme Court's *Jacobsen* opinion suggests that the critical inquiry under the Fourth Amendment is whether the authorities obtained information with respect to which the defendant's expectation of privacy has not already been frustrated. Thus, *Jacobsen* directs courts to inquire whether the government learned something from the police search that it could not have learned from the private searcher's testimony and, if so, whether the defendant had a legitimate expectation of privacy in that information. *See Jacobsen,* 466 U.S. at 118–20, 104 S.Ct. 1652. Since *Jacobsen,* the Court has not elaborated on the nature of the inquiry courts should use to determine whether a police search has exceeded the scope of a prior private search.

The decisions of our sister circuits similarly provide only limited guidance about the nature of this inquiry. Several courts of appeals have indicated that police exceed the scope of a prior private search when they examine objects or containers that the private searchers did not examine. *See, e.g., United States v. Rouse,* 148 F.3d 1040, 1041 (8th Cir.1998); *United States v. Kinney,* 953 F.2d 863, 866 (4th Cir.1992); *United States v. Donnes,* 947 F.2d 1430, 1434 (10th Cir.1991). Far fewer courts

have addressed the question whether police exceed the scope of a private search when they examine the same materials as private searchers but examine these materials more thoroughly or in a different manner. While the Supreme Court's distinction in *Walter* between the private searchers' actions in holding the filmstrips up to the light and the police's actions in projecting the filmstrips suggests that the "thoroughness" of the police examination is a relevant factor, the one court of appeals to expressly consider this factor after *Walter* did not find such a difference in thoroughness to be dispositive. *See United States v. Simpson,* 904 F.2d 607, 610 (11th Cir.1990) (finding that the F.B.I.'s search of a box containing pornographic videos and magazines "did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because they took more time and were more thorough" than the private searchers).

Due to the lack of definitive guidance from the Supreme Court and the lack of consensus among our sister circuits regarding the precise nature of the evaluation required, we must tread carefully in our disposition of this issue. Today, we address only three narrow questions: (1) whether a police search exceeds the scope of a private search when private searchers examine selected items from a collection of similar closed containers and police searchers subsequently examine the entire collection; (2) whether a police search exceeds the scope of the private search when the police examine more items within a particular container than did the private searchers; and (3) whether a police search exceeds the scope of a private search when

---

**12.** In the few instances where this court has had the opportunity to consider the applicability of the private search doctrine, we have either declined to reach the issue, *see, e.g., United States v. Grosenheider,* 200 F.3d 321,

327 (5th Cir.2000), or our analysis has been limited to a conclusory statement that the police searchers did not exceed the scope of the private search. *See, e.g., Paige,* 136 F.3d at 1020; *Bomengo,* 580 F.2d at 176.

police searchers identify the subject of a photograph that the private searchers could not identify. Our review of the admittedly scarce jurisprudence indirectly addressing these inquiries leads us to conclude that the police have exceeded the scope of the private search in the instant case.

Initially, we address whether the police exceeded the scope of the private search when they examined the entire collection of "containers" (i.e., the disks) turned over by the private searchers, rather than confining their search to the selected containers examined by the private searchers.[13] There are two lines of authority from other circuits that are instructive in addressing this question.

The Tenth Circuit and the Fourth Circuit have held that a police search exceeds the scope of a prior private search when the police open a container that the private searchers did not open. In *Donnes*, the defendant's landlord found a glove in the defendant's apartment containing a syringe and a camera lens case. Police officers subsequently opened the camera lens case without obtaining a warrant and discovered plastic bags containing methamphetamines. The Tenth Circuit held that the police searchers exceeded the scope of the private search by opening the camera lens case. The court reasoned that closed containers are subject to protection under the Fourth Amendment and that the police's lawful seizure of the glove did not compromise the defendant's expectation of privacy in the contents of the closed container found inside the box. Thus, the Fourth Amendment required the police to obtain a warrant before opening the container and inspecting its contents. *See Donnes*, 947 F.2d at 1436.

In *Kinney*, the defendant's girlfriend called the police when she found guns in his closet that she suspected were stolen. The police confiscated the guns from the closet and then opened a white canvas bag located in the same closet. They found various items of drug paraphernalia in the bag. The Fourth Circuit held that the police exceeded the scope of the private search when they opened the canvas bag.[14] *See Kinney*, 953 F.2d at 866.

These cases, indicating that police exceed the scope of a prior private search when they open a container that the private searchers did not inspect, can be contrasted with the Eighth Circuit's holding in *United States v. Bowman*, 907 F.2d 63 (8th Cir.1990). In *Bowman*, an airline employee opened an unclaimed suitcase and found five identical bundles wrapped in towels and clothing. The employee opened one bundle and found a white powdery substance wrapped in plastic and duct tape. He contacted a federal narcotics agent, who identified the exposed bundle as a kilo brick of cocaine and then opened the other bundles, which also contained kilo bricks of cocaine. The court held that the agent did not act improperly in failing to secure a warrant to unwrap the remaining identical bundles,[15] reasoning that the presence of the cocaine in the exposed bundle " 'spoke volumes as to

---

**13.** We reiterate the caveat that we are assuming without deciding that the parties are correct in their characterization of computer storage devices as "closed containers."

**14.** However, the court did not suppress the evidence. The court reasoned that the police were acting under a reasonable, albeit erroneous, belief that the defendant's girlfriend had

authority to consent to the search. *See Kinney*, 953 F.2d at 866.

**15.** We note that the Eighth Circuit in *Bowman* never determined whether the individually wrapped bundles were "containers" as that term has been used in the context of Fourth Amendment jurisprudence.

[the] contents [of the remaining bundles]—particularly to the trained eye of the officer.'" *Id.* at 65 (quoting *Jacobsen,* 466 U.S. at 121, 104 S.Ct. 1652).

 The Supreme Court's guidance in *Jacobsen* is useful in reconciling the apparent tension between the Eighth Circuit's approach in *Bowman* and the Tenth and Fourth Circuits' ostensible conclusion in *Donnes* and *Kinney* that opening a new container is per se exceeding the scope of a prior private search. The *Jacobsen* Court emphasized that the police's actions in that case were unproblematic from a Fourth Amendment perspective because their actions "enabled ... [them] to learn nothing that had not previously been learned during the private search." 466 U.S. at 120, 104 S.Ct. 1652. Thus, under *Jacobsen,* confirmation of prior knowledge does not constitute exceeding the scope of a private search. In the context of a search involving a number of closed containers, this suggests that opening a container that was not opened by private searchers would not necessarily be problematic if the police knew with substantial certainty, based on the statements of the private searchers, their replication of the private search, and their expertise, what they would find inside. Such an "expansion" of the private search provides the police with no additional knowledge that they did not already obtain from the underlying private search and frustrates no expectation of privacy that has not already been frustrated.

This reading of *Jacobsen* harmonizes *Bowman* with *Kinney* and *Donnes.* Based on their inspection of the one bundle opened by the private searchers, their own expertise, and the apparent similarity of the bundles, the police in *Bowman* were substantially certain that the other four unopened bundles in the suitcase also contained kilos of cocaine. Thus, they did not exceed the scope of the private search in simply confirming this substantial certainty, despite the fact that they looked at additional containers (or additional items within a container) that the private searchers did not examine.

In contrast, in both *Kinney* and *Donnes* the police's opening of containers that the private searchers did not examine did not serve to confirm information of which they were already substantially certain. In *Kinney,* the police had no reason to believe that the duffel bag located in the same closet as the defendant's illegal weapons contained contraband. In opening the bag, they were not confirming the presence of illegal weapons or any other information that they obtained from the private searcher. Similarly, in *Donnes,* the police search of the camera case provided them with a piece of information—i.e., the defendant's possession of methamphetamines—that they could not have known based on the private search. There is no indication that the private search in *Donnes* made police aware that the defendant possessed methamphetamines. Thus, by opening the additional container, they were not simply confirming knowledge gained by private searchers.

 The guideline that emerges from the above analysis is that the police exceed the scope of a prior private search when they examine a closed container that was not opened by the private searchers unless the police are already substantially certain of what is inside that container based on the statements of the private searchers, their replication of the private search, and their expertise. This guideline is sensible because it preserves the competing objectives underlying the Fourth Amendment's protections against warrantless police searches. A defendant's expectation of privacy with respect to a container unopened by the private searchers is pre-

served unless the defendant's expectation of privacy in the contents of the container has already been frustrated because the contents were rendered obvious by the private search. Moreover, this rule discourages police from going on "fishing expeditions" by opening closed containers. Any evidence that police obtain from a closed container that was unopened by prior private searchers will be suppressed unless they can demonstrate to a reviewing court that an exception to the exclusionary rule is warranted because they were substantially certain of the contents of the container before they opened it.

■ Applying this guideline to the facts of the instant case reveals that the police's pre-warrant examination of the disks clearly exceeded the scope of the private search. The police could not have concluded with substantial certainty that all of the disks contained child pornography based on knowledge obtained from the private searchers, information in plain view, or their own expertise. There was nothing on the outside of any disk indicating its contents. Moreover, Judith's testimony at the suppression hearing reveals that she did not know the contents of the disks that she turned over, apart from the particular samples that she and Brandie had examined.[16] Indeed, she could not have known the contents of any of the ZIP disks, as she and Brandie did not use hardware capable of reading these disks in their private search. The mere fact that the disks that Judith and Brandie did not examine were found in the same location in Runyan's residence as the disks they did examine is insufficient to establish with substantial certainty that all of the storage media in question contained child pornography.

Thus, the police exceeded the scope of the private search in the instant case when they examined disks that the private searchers did not examine. Both these disks and any evidence obtained as a result of the information found on these disks are potentially subject to suppression. *See* Part II(2), *infra*.

■ Runyan further contends that the police exceeded the scope of the private search because they examined more files on each of the disks than did the private searchers. Initially, it is important to note that it is not clear from the record that this is true. Agent Nuckles testified that, while he did look at each of the storage devices turned over by Judith prior to obtaining a warrant, he only looked at two or three images on each of these disks. It is unnecessary for us to address this factual dispute, however, as we find that it would not have been constitutionally problematic for the police to have examined more files than did the private searchers. We agree with the Eleventh Circuit's position in *Simpson* that the police do not exceed the scope of a prior private search when they examine the same materials that were examined by the private searchers, but they examine these materials more thoroughly than did the private parties. *See Simpson*, 904 F.2d at 610. In the context of a closed container search, this means that the police do not exceed the private search when they examine more items within a closed container than did the private searchers. Though the Supreme Court has long recognized that individuals have an expectation of privacy in closed containers, *see, e.g., Smith v. Ohio*, 494 U.S. 541, 542, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990) (per curiam); *United*

---

**16.** In fact, the record reveals that some of the CDs that Brandie brought back to Judith's Brownwood home did not actually contain child pornography and instead contained family photographs.

*States v. Ross,* 456 U.S. 798, 822, 102 S.Ct. 2157, 72 L.Ed.2d 572, (1982), an individual's expectation of privacy in the contents of a container has already been compromised if that container was opened and examined by private searchers, *see, e.g., Jacobsen,* 466 U.S. at 119, 104 S.Ct. 1652. Thus, the police do not engage in a new "search" for Fourth Amendment purposes each time they examine a particular item found within the container.

In so holding, we reject the reasoning espoused by the Eighth Circuit in *Rouse,* where that court held that the police exceeded the scope of a private search when they found and examined more items within an airline passenger's bag than the airline employees had found in their prior private search. *Rouse,* 148 F.3d at 1041. We adopt the logic of *Simpson* over that of *Rouse* based on our determination that *Rouse* is inconsistent with the objectives underlying the warrant requirement and the exclusionary rule. Under the reasoning of *Rouse,* police would exceed the scope of a private investigation and commit a warrantless "search" in violation of the Fourth Amendment each time they happened to find an item within a container that the private searchers did not happen to find. Police would thus be disinclined to examine even containers that had already been opened and examined by private parties for fear of coming across important evidence that the private searchers did not happen to see and that would then be subject to suppression. The *Rouse* approach would over-deter the police, preventing them from engaging in lawful investigation of containers where any reasonable expectation of privacy has already been eroded. This approach might also lead police to waste valuable time and resources obtaining warrants based on intentionally false or mistaken testimony of private searchers, for fear that, in confirming the private testimony

before obtaining a warrant, they would inadvertently violate the Fourth Amendment if they happened upon additional contraband that the private searchers did not see.

Because we find that the police do not exceed the scope of a prior private search when they examine particular items within a container that were not examined by the private searchers, we accordingly determine that the police in the instant case did not exceed the scope of the private search if they examined more files on the privately-searched disks than Judith and Brandie had. Suppression of any such files is therefore unnecessary.

Finally, Runyan contends that the police exceeded the scope of the private search when they printed out the images of Misty that they had found on the computer and showed these images to employees at the District Attorney's office in an attempt to identify her. He contends that Misty's testimony should thus be suppressed because it is the "fruit of the poisonous tree," i.e., because Misty's identification was derived from the police's illegal conduct in exceeding the scope of the private search. We find it unnecessary to decide today whether a police search exceeds the scope of a private search when police searchers identify the subject of a photograph that the private searchers could not identify.

There is significant factual dispute in the record regarding whether Melissa Payne, the intern in the District Attorney's office, positively identified Misty via printouts of the computerized images or via the Polaroid photographs that Judith found in the duffel bag from Runyan's barn. Payne testified at the suppression hearing (and the government maintains) that she identified Misty via the Polaroids. Because we must interpret these facts in the light most favorable to the government, we must as-

sume that the actual positive identification came from photographs, not the computer printouts. *See, e.g., United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir.1984) ("In reviewing a trial court's ruling on a motion to suppress ... the evidence must be viewed in the light most favorable to the party prevailing below, except where such a view is either not consistent with the trial court's findings or is clearly erroneous considering the evidence as a whole."). Thus, because we find that Misty's testimony stemmed from evidence (i.e., the Polaroids) that was clearly within the scope of the private search and not the product of illegal police activity, we need not consider whether the act of printing out and circulating the computer images of Misty exceeded the scope of the private search.

### 2. Is the Exclusionary Rule Applicable?

The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure. The rule excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court further extended the exclusionary rule to encompass evidence that is the indirect product or "fruit" of unlawful police conduct. Thus, in the instant case, any "fruits" of the portion of the police search that exceeded the scope of the private search—including any disks that the private searchers did not examine but were viewed by the police prior to the

issuance of the warrant—should have been excluded at trial.[17]

However, evidence that is otherwise suppressible under the exclusionary rule is admissible if the connection between the alleged illegality and the acquisition of the evidence is so attenuated as to dissipate the "taint" of the unlawful police activity. *See Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In applying this principle, the Court has crafted a number of exceptions to the exclusionary rule. These exceptions are designed to ensure that the exclusionary rule puts police "in the same, not a *worse* position than they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (emphasis in original).

In *United States v. Miller*, 666 F.2d 991, 995 (5th Cir.1982), this court outlined the three primary exceptions to the exclusionary rule. Evidence will be admissible despite the exclusionary rule if: (1) it "derives from an independent source," (2) it "has an attenuated link to the illegally secured evidence," or (3) it "inevitably would have been discovered during police investigation without the aid of the illegally obtained evidence." *Id.* (internal citations omitted).

The government argues that the "independent source" exception to the exclusionary rule is applicable in the instant case. The government's position is that the magistrate judge's decision to issue a warrant permitting police to search the computer and the disks was independent of the pre-warrant searches—the same warrant would have been issued even if the police had never conducted a pre-warrant

---

**17.** It should be noted that there is no way of knowing which disks were examined by the private searchers. Thus, if suppression is deemed appropriate, this uncertainty will necessitate suppression of all the disks.

search of the storage media because the information that the police obtained from Judith's testimony, Runyan's admissions to the police, and Misty's testimony was sufficient to support the warrant. The government maintains that, because the police could have obtained all the information that they acquired through their pre-warrant search of the disks during their subsequent searches pursuant to the warrant, these subsequent, lawful searches were an "independent source," and the information is therefore admissible at trial.

The "independent source" exception to the exclusionary rule was outlined by the Supreme Court in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). In that case, the Court considered whether marijuana that was observed by police in plain view at the time of an unlawful entry and that was later seized during a subsequent search pursuant to a warrant was admissible evidence. The Court first clarified that the independent source rule applies not only to evidence obtained for the first time during an independent lawful search, but also to evidence initially discovered during or as a consequence of an unlawful search but later obtained independently from activities untainted by the initial illegality. *Id.* at 537–38, 108 S.Ct. 2529. The Court held that, in order for a later search pursuant to a warrant to be deemed "genuinely independent" of a prior illegal entry, the government must demonstrate two things: (1) that the police would still have sought a warrant in the absence of the illegal search; and (2) that the magistrate judge

would still have issued the warrant had the supporting affidavit not contained information stemming from the illegal search. *Id.* at 542, 108 S.Ct. 2529. Because the district court made no specific factual findings addressing whether the police would have sought a warrant in the absence of their prior illegal entry, the Court remanded the case for an explicit finding on this issue.

■ Thus, in order to avoid suppression of any images on the disks that were not examined by the private searchers, the government must demonstrate that it would have both sought and obtained a warrant even if the police had never exceeded the scope of the private search. In *Murray*, the Supreme Court indicated that the district court's finding that the agents did not reveal their prior warrantless entry to the magistrate judge in the warrant application was sufficient to demonstrate that the police would have obtained a warrant in the absence of the illegal search. *Murray*, 487 U.S. at 543, 108 S.Ct. 2529. In the instant case, however, one of the affidavits submitted by Agent Nuckles in support of the warrant applications refers to his pre-warrant search of the computer storage devices, indicating that Nuckles conducted a "cursory" review of the materials prior to his application.[18] The inclusion of this statement raises a question about whether and to what extent the magistrate judge relied on this statement in issuing the warrants. The district court made no factual findings at the suppression hearing addressing this issue.

---

**18.** Admittedly, this information about Agent Nuckles's pre-warrant search activities was contained in the affidavit underlying the warrant application for Runyan's ranch house rather than the affidavit underlying the warrant application for Runyan's computer and disks. However, given that these affidavits were submitted at the same time and were virtually identical in all other respects, we cannot definitively establish (as the Court in *Murray* could) that these statements regarding Nuckles's pre-warrant search activities played no role in the magistrate judge's decision to issue the warrant for Runyan's computer and disks.

Similarly, the district court made no specific factual findings at the suppression hearing indicating whether the police would have sought the warrants if they had not previously exceeded the scope of the private search. As such factual determinations are clearly within the province of the district court, a remand to that court is required.

We retain jurisdiction over these appeals and make a limited remand in No. 00–10821 to the district court to conduct such proceedings as are necessary to make findings of fact addressing: (1) whether the police would have sought the warrants had the police never exceeded the scope of the private search; and (2) whether the magistrate judge would have issued the warrants had one of the supporting affidavits not contained a reference to the illegal pre-warrant search activities. Both parties may develop evidence relating to these inquiries. *See United States v. Parker,* 722 F.2d 179, 185 (5th Cir.1983) (ordering a similar limited remand), *overruled on other grounds sub nom., United States v. Hurtado,* 905 F.2d 74, 75–76 (5th Cir.1990) (en banc).

The clerk of this court is directed to return the record in No. 00–10821 to the district court. Within forty-five days after entry of this remand, the district court shall provide a supplemental order setting forth its factual findings. Once the district court's supplemental order is entered, the clerk of the district court shall return the record, as supplemented, to this court for disposition of these appeals by this panel. The parties may then file supplemental letter briefs addressing the findings contained in the district court's supplemental order on an expedited basis to be established by the clerk of this court.

We do not reach the other issues raised in these appeals at this time.

### III. Conclusion

For the foregoing reasons, we retain jurisdiction over these appeals and RE-MAND No. 00–10821 to the district court on a limited basis for proceedings consistent with this opinion.