IN THE SUPREME COURT OF NORTH CAROLINA

No. 55A18

Filed 16 August 2019

STATE OF NORTH CAROLINA

v.

JAMES HOWARD TERRELL, JR.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 810 S.E.2d 719 (N.C. Ct. App. 2018), reversing in part an order on defendant's motion to suppress and remanding for additional proceedings following an appeal from judgments entered on 17 November 2016 by Judge Beecher R. Gray in Superior Court, Onslow County. On 20 September 2018, the Supreme Court allowed the State's petition for discretionary review of additional issues. Heard in the Supreme Court on 5 March 2019.

*Joshua H. Stein, Attorney General, by Derrick C. Mertz, Special Deputy Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Michele A. Goldman, Assistant Appellate Defender, for defendant-appellee.*

EARLS, Justice.

Here we are asked to decide whether a law enforcement officer's warrantless search of defendant's USB drive, following a prior search of the USB drive by a private individual, was permissible under the "private-search doctrine." The Court of Appeals concluded that the warrantless search violated defendant's Fourth

Amendment rights and remanded to the trial court for a determination of whether there was probable cause for the issuance of a search warrant without the evidence obtained from the unlawful search. *State v. Terrell*, 810 S.E.2d 719 (N.C. Ct. App. 2018). We affirm.

Background

In February 2013, defendant, James H. Terrell, Jr., returned from overseas work as a contractor in the Philippines and resumed living with his long-time girlfriend, Jessica Jones, in her home.[1] Defendant and Ms. Jones had been in a relationship for over ten years and had two children together. Ms. Jones also had an older daughter from an earlier relationship, Cindy, who had a daughter, Sandy.

On 13 January 2014, while defendant was at work, Ms. Jones began searching for a photograph of defendant's housekeeper in the Philippines in order "to put a face to the person[ ]" of whom defendant had spoken. Ms. Jones located and opened defendant's briefcase, in which she found paperwork and three USB "thumb drives," one of which was purple. After plugging the purple USB thumb drive (the thumb drive) into a shared computer, Ms. Jones "opened it" and began clicking through "folders and sub-folders." Ms. Jones later stated at the suppression hearing that she observed "images of adult women and . . . children" that "were not inappropriate," images of the housekeeper in the Philippines, and images of a "childhood friend" of

---

[1] Like the Court of Appeals, we use pseudonyms in reference to Ms. Jones, Cindy, and Sandy.

defendant's. Ms. Jones testified: "I honestly do not recall any images of [defendant] and I. And in those pictures there are no images of him. There are just pictures of women and the young ladies I just spoke of." According to Ms. Jones, "the pictures were all in one folder and then the other folders were like movies because [defendant] likes military movies," and she did not "think the folders had a title. It was just a thumb -- it's the title of the thumbdrive, purple rain." As Ms. Jones "got past" the images of defendant's childhood friend, she saw an image of her granddaughter, Sandy, who was nine years old at the time, sleeping in a bed "and . . . exposed from the waist up." Upon seeing the image of Sandy, Ms. Jones became upset and ceased her search of the thumb drive.

That evening, after Ms. Jones had spoken with her daughter, Cindy, and "let[ ] her know what [she] had discovered," together they took the thumb drive to the Onslow County Sheriff's Department. Ms. Jones and Cindy met with Detective Lucinda Hernandez, reported what Ms. Jones had discovered on the thumb drive, and left the thumb drive with Detective Hernandez. Detective Hernandez "did not view the purple flash drive," but "accepted [it] and logged it into the Crime Scene Investigation (CSI) Unit of the Onslow County Sheriff's Department."

On the following day, Ms. Jones and Cindy met with Detective Eric Bailey at the Sheriff's Department and explained what they had discovered on the thumb drive. After meeting with Ms. Jones and Cindy, Detective Bailey "went down to the CSI department . . . to verify the information." Detective Bailey, with the assistance of a

member of the CSI Unit, plugged in the thumb drive and went "through checking it to try to find the image that [Ms. Jones] stated that was on there"—"a nude or partially nude photograph of her granddaughter." Detective Bailey stated: "As I was scrolling through, of course, there was a lot of photos in there so I'm clicking trying to find exactly where this image is located at. I observed several -- multiple images of adult females and also [defendant] together clothed, nude, partially nude." As he was trying to locate the image of Sandy, Detective Bailey discovered what he believed might be child pornography; specifically, he "observed other young females, prepubescent females, unclothed, also some that were clothed." Eventually, Detective Bailey "[s]tarted to observe other photographs of women overseas, and then finally happened upon the photograph with the granddaughter." At that point, Detective Bailey ceased his search of the thumb drive and left it with the CSI Unit.

Detective Bailey applied for a search warrant on 5 February 2014 to search the thumb drive and other property of defendant "for contraband images of child pornography and evidence of additional victims and crimes committed in this case." In his affidavit attached to this initial search warrant application, Bailey did not state that he had already searched the thumb drive or include any information he obtained from that search. Bailey instead relied on information from Ms. Jones, including her allegation that she had discovered the image of Sandy on defendant's thumb drive, as well as allegations that Ms. Jones's other daughter had at some point previously told Ms. Jones that defendant "touched me down there" and that later a floppy disk

containing child pornography had been discovered in defendant's truck. A magistrate issued the warrant but, according to Bailey, he had to apply for another search warrant because he "received a call from the [State Bureau of Investigation] stating that they wanted additional information on the search warrant." Accordingly, Detective Bailey applied for another search warrant on 5 May 2014, which was issued by a magistrate on the same day. In the affidavit supporting this second warrant application, Bailey included information from his search of the thumb drive, stating that he saw "several partially nude photographs of" Sandy and "severally fully nude photographs of an unknown child standing beside and [sic] adult female in various sexual positions."

Pursuant to the second warrant, an SBI agent conducted a thorough "forensic examination" of the thumb drive, which was titled "purple rain" and contained various folders and subfolders. The SBI agent discovered the image of Sandy in a folder named "red bone" and he uncovered twelve additional incriminating images located in a different folder named "Cabaniia." Ten of those twelve images had been deleted and archived and would not have been ordinarily viewable without a "forensic tool." Defendant was indicted for four counts of second-degree sexual exploitation of a minor, one count of possessing a photographic image from peeping, and twelve counts of third-degree sexual exploitation of a minor.

Defendant filed a pretrial motion to suppress "any and all evidence obtained as a result of" Detective Bailey's search of his thumb drive, arguing that Bailey

"conducted a warrantless search of property in which the Defendant had a ligitimate [sic] expectation of privacy," that the 5 May 2014 search warrant was based on evidence unlawfully obtained from that search, and that in the absence of that tainted evidence the search warrant was unsupported by probable cause. At the suppression hearing, after receiving testimony from Ms. Jones and Detective Bailey and considering the arguments of the parties, the trial court orally denied defendant's motion. In a written order dated on 29 November 2016, the trial court found, in pertinent part:

2. . . . [Ms. Jones's] stated purpose for looking in defendant's briefcase was to put a face to someone that defendant had talked about. Ms. [Jones's] entry into defendant's briefcase and the contents therein were solely at her own volition and not connected with or at the suggestion of any law enforcement person or organization.

3. [Ms. Jones] inserted the purple flash drive into a shared Apple computer and discovered, among other visual representations, a picture of her granddaughter, [Sandy], who appeared to be asleep and who was nude from the waist up with breasts displayed. After consulting with her daughter, the mother of [Sandy], Ms. [Jones] and her daughter, on January 13, 2014, took the purple flash drive to the Onslow County Sheriff's Department.

. . . .

5. On January 14, 2014, [Ms. Jones] again appeared at the Onslow County Sheriff's Department to meet with Detective Eric Bailey concerning the purple flash drive and the contents that she had seen on that flash drive. Detective Bailey discussed with Ms. [Jones] the visual

representations she had discovered on the purple flash drive.

6. Following his discussion with [Ms. Jones], Detective Bailey went to the CSI Unit to confirm on the purple flash drive what he had been told by [Ms. Jones]. . . . The CSI technician placed the purple flash drive into CSI's computer and selected the folder that had been identified by [Ms. Jones] as containing the picture of her granddaughter [Sandy]. This viewing in the CSI Unit confirmed what [Ms. Jones] had told Detective Bailey that she had discovered on the flash drive. In addition to the picture of [Sandy] Detective Bailey saw photographs of other nude or partially nude prepubescent females posing in sexual positions.

7. The images observed by Detective Bailey corroborated the information provided to him by [Ms. Jones]. Based upon that corroboration and [Ms. Jones's] statements, Detective Bailey then obtained a search warrant in order to conduct a complete and thorough forensic examination of the purple flash drive.

8. Detective Bailey's initial search and examination of the purple flash drive in the CSI Unit did not exceed the scope of the private, prior search done by [Ms. Jones], but could have been more thorough.

Based on these findings, the trial court concluded, in relevant part:

2. [Ms. Jones's] viewing of the purple flash drive did not violate the Fourth Amendment because she was a private party not acting under the authority of the State of North Carolina. Her viewing of the purple flash drive effectively frustrated Defendant's expectation of privacy as to the contents of the purple flash drive, and thus the later viewing by Detective Bailey at her request and upon presentation of the flash drive to [law enforcement] did not violate Defendant's rights under the Fourth Amendment.

3. None of the Defendant's rights under the Constitution or laws of the United States of America or of the Constitution or laws of the State of North Carolina were violated during the seizure and search of the purple flash drive in this case.

Accordingly, the trial court denied defendant's motion to suppress.

At trial, at the close of all evidence, the State elected not to proceed on three charges of second-degree sexual exploitation of a minor and dismissed those counts. The jury convicted defendant of the remaining fourteen counts and the trial court sentenced him to twelve consecutive terms of five to fifteen months each, plus a concurrent term of twenty to eighty-four months for the second-degree sexual exploitation charge. The court imposed a suspended sentence for the secret peeping conviction. Defendant appealed the trial court's denial of his motion to suppress.

At the Court of Appeals, defendant first argued that the trial court erred in concluding that Jones's viewing of the thumb drive effectively frustrated his expectation of privacy in the device's entire contents, thereby permitting Detective Bailey to subsequently conduct a warrantless search of all the thumb drive's digital data. *State v. Terrell*, 810 S.E.2d at 727. The Court of Appeals majority agreed, noting that North Carolina courts had not previously considered the "private-search doctrine" in the context of electronic storage devices. *Id.* at 728; *see also id.* at 727 (explaining that under the "private-search doctrine," "[o]nce an individual's privacy interest in particular information has been frustrated by a private actor, who then reveals that information to police, the police may use that information, even if

obtained without a warrant" (citing *United States v. Jacobsen*, 466 U.S. 109, 117 (1984))).

The majority distinguished the Court of Appeals' prior decision in *State v. Robinson*, in which the court concluded that police could permissibly view an entire videotape after a private searcher viewed only portions of that videotape because "the police do not exceed the scope of a prior private search when they examine the same materials . . . [ ] more thoroughly than did the private parties." *Id.* at 728 (first alteration in original) (quoting *State v. Robinson*, 187 N.C. App. 795, 798, 653 S.E.2d 889, 892 (2007)). The majority rejected the State's contention that the thumb drive was a similar "container" that, once opened, frustrated any expectation of privacy in the device's entire contents. *Id.* at 728–29. According to the majority, "electronic storage devices are unlike videotapes, and a search of digital data on a thumb drive is unlike viewing one continuous stream of video footage on a videotape. . . . One thumb drive may store thousands of videos, and it may store vastly more and different types of private information than one videotape." *Id.* at 728. In reaching this conclusion, the majority noted that it was "guided by the substantial privacy concerns implicated in searches of digital data that the United States Supreme Court expressed in *Riley v. California*." *Id.* at 729 (citing *Riley*, 134 S. Ct. 2473, 2485 (2014)).

Turning to the search at issue, the majority stated that under the private-search doctrine as set forth in *United States v. Jacobsen*, "a follow-up police search

must be tested by the degree to which that officer had 'virtual certainty' the privately searched item contained 'nothing else of significance' other than the now non-private information, and that his inspection of that item 'would not tell him anything more than' what the private searcher already told him." *Id.* at 731 (quoting *Jacobsen*, 466 U.S. at 119). The majority concluded that while "the trial court should have made detailed findings on the exact scope of both Jones's and Detective Bailey's searches of the thumb drive's contents," the "findings on the precise scope of both searches are immaterial in this particular case, in light of the other findings establishing that *Jacobsen*'s virtual-certainty requirement was not satisfied and, therefore, Detective Bailey's search was unauthorized under the private-search doctrine." *Id.* at 731–32 (citation omitted). Accordingly, the majority held that "Detective Bailey's warrantless thumb drive search [was not] authorized under the private-search doctrine, nor was he able to use the evidence he obtained during that search to support his warrant application." *Id.* at 734.

Next, defendant argued that without the information Detective Bailey acquired from the warrantless search, the warrant application failed to establish probable cause. *Id.* at 734. The majority noted that "because the trial court determined that the evidence acquired by Detective Bailey's warrantless search was lawful under the private-search doctrine, the trial court never determined whether striking that information from his application would still supply probable cause to issue the search warrant." *Id.* at 735. The majority determined that under *State v.*

*McKinney*, "remand to the trial court [is] more appropriate than unilateral appellate court determination of the warrant's validity[.]" *Id.* at 735 (alterations in original) (quoting *McKinney*, 361 N.C. 53, 64, 637 S.E.2d 868, 875 (2006)). Accordingly, the majority reversed the trial court's denial of defendant's motion to suppress and remanded "to the trial court to determine, in the first instance, whether probable cause existed to issue the search warrant after excising from Detective Bailey's warrant application the tainted evidence arising from his unlawful search." *Id.* at 735.

In a separate opinion, one member of the panel dissented in part. *Id.* at 736 (Stroud, J., concurring in part and dissenting in part). The dissenting judge "generally agree[d] with the majority's analysis of the private search doctrine and determination that a thumb drive is not a single container" but opined that "the majority's analysis overlooks the fact that Detective Bailey attempted to limit his initial search to find the image reported by Ms. Jones." *Id.* at 738. According to the dissenting judge, "Detective Bailey was 'substantially certain' the drive would contain the 'granddaughter image,' " and he "sought to replicate Ms. Jones's private search but since she did not understand the organization of the drive, he could not go directly to the particular image he was seeking." *Id.* at 739–40. The dissenting judge would have found no error in the convictions stemming from "[t]he granddaughter image and two seen photos Detective Bailey found while searching for the granddaughter image" because they "fall within the scope of the private search doctrine, and they too

were properly not suppressed by the trial court." *Id.* at 740. Additionally, the dissenting judge determined that "the granddaughter image and the two seen images would support probable cause for the other ten deleted images" but "concur[red] with the majority to remand to the trial court to determine probable cause for issuance of the search warrant for the ten deleted images." *Id.* at 740.

The State appealed on the basis of the dissent pursuant to N.C.G.S. § 7A-30(2). The State also filed a petition for discretionary review of additional issues on 13 March 2018, which we allowed in part on 20 September 2018.

Standard of Review

We review a trial court's ruling on a motion to suppress to determine "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167–68, 712 S.E.2d 874, 878 (2011) (citing *State v. Brooks*, 337 N.C. 132, 140–41, 446 S.E.2d 579, 585 (1994)). We review the trial court's conclusions of law de novo. *Id.* at 168, 712 S.E.2d at 878 (citing *State v. McCollum*, 334 N.C. 208, 237, 433 S.E.2d 144, 160 (1993), *cert. denied*, 512 U.S. 1254 (1994), *convictions vacated and case dismissed with prejudice*, *State v. McCollum*, No. 83CRS15506-07, 2014 WL 4345428 (N.C. Super. Ct. Robeson County, Sept. 2, 2014)). We review decisions of the Court of Appeals for errors of law. *State v. Romano*, 369 N.C. 678, 685, 800 S.E.2d 644, 649 (2017) (citing *Brooks*, 337 N.C. at 149, 446 S.E.2d at 590).

Analysis

The State argues that the Court of Appeals, in concluding that Detective Bailey's search of the thumb drive constituted an unreasonable search under the Fourth Amendment, erred by applying an unnecessarily restrictive rule that is inconsistent with the private-search doctrine as set forth in *Jacobsen.* We disagree.

"The United States and North Carolina Constitutions both protect against unreasonable searches and seizures of private property." *State v. Lowe*, 369 N.C. 360, 364, 794 S.E.2d 282, 285 (2016) (first citing U.S. Const. amend. IV; and then citing N.C. Const. art. I, § 20). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Jacobsen*, 466 U.S. at 113. Because the Fourth Amendment "proscrib[es] only governmental action[,] it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *Id.* (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). Searches conducted by governmental officials in the absence of a judicial warrant "are presumptively unreasonable, though the Court has recognized a few limited exceptions to this general rule." *United States v. Karo*, 468 U.S. 705, 717 (1984) (citations omitted). When seeking "to admit evidence discovered by way of a warrantless search in a criminal prosecution," the State bears the burden of establishing that the search falls under an exception to the warrant requirement. *State v. Cooke*, 306 N.C. 132, 135, 291 S.E.2d 618, 620 (1982) (first citing *Chimel v. California*, 395 U.S. 752, 762 (1969);

and then citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)). The Supreme Court set forth one such exception in *Jacobsen* involving circumstances in which a warrantless search by government officials may be permissible when conducted in reliance upon an antecedent search by a private individual.

In *Jacobsen* employees at an airport FedEx office opened a damaged package—"an ordinary cardboard box wrapped in brown paper"—to examine the package's contents in compliance with a company policy concerning insurance claims. 466 U.S. at 111. Inside the box employees found "five or six pieces of crumpled newspaper" covering a tube, which was "about 10 inches long" and made of duct tape. *Id.* After cutting open the tube, the employees discovered "a series of four zip-lock plastic bags, the outermost enclosing the other three and the innermost containing about six and a half ounces of white powder." *Id.* Upon finding the white powder, the employees notified the Drug Enforcement Administration (DEA), replaced the plastic bags in the tube, and placed the tube and newspapers back into the box. *Id.* The first DEA agent who arrived "saw that one end of the tube had been slit open; he removed the four plastic bags from the tube and saw the white powder." *Id.* He proceeded to open the series of plastic bags and, using a knife blade, "removed a trace of the white substance," which "[a] field test made on the spot identified . . . as cocaine." *Id.* at 111–12. DEA agents then obtained a warrant to search the location to which the package was addressed and ultimately arrested the recipients. *Id.* at 112. The Supreme Court granted certiorari to address the recipients' arguments "that the

warrant was the product of an illegal search and seizure." *Id.* at 112–13.

The Court noted that "[t]he reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *Id.* at 115. Central to that inquiry in *Jacobsen*, the Court noted, were "[t]he initial invasions of respondents' package," which "did not violate the Fourth Amendment because of their private character." *Id.* The Court stated, "The additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* According to the Court, "[t]his standard follows from the analysis applicable when private parties reveal other kinds of private information to the authorities," specifically—"[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information." *Id.* at 117. Rather, "[t]he Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated," in which case "the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a warrant." *Id.* at 117–18.

In *Jacobsen*, the federal agent who first arrived at the scene knew when he saw the package that "it contained nothing of significance" other than a tube with "plastic bags and, ultimately, white powder." *Id.* at 118. According to the Court:

> [T]here was a virtual certainty that nothing else of

> significance was in the package and that a manual
> inspection of the tube and its contents would not tell him
> anything more than he already had been told. . . .
> Respondents could have no privacy interest in the contents
> of the package, since it remained unsealed and since the
> Federal Express employees had just examined the package
> and had, of their own accord, invited the federal agent to
> their offices for the express purpose of viewing its contents.

*Id.* at 119. "Similarly," the Court continued, "the removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a 'search' within the meaning of the Fourth Amendment." *Id.* at 120 (footnote omitted). Notably, in responding to the concurring Justice's suggestion that the Court was "sanction[ing] warrantless searches of closed or covered containers or packages whenever probable cause exists as a result of a prior private search," *id.* at 129 (White, J., concurring), the Court stressed that the visibility of the white powder was "far less significant than the facts that the container could no longer support any expectation of privacy, and that it was virtually certain that it contained nothing but contraband. . . . A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant." *Id.* at 120 n.17 (majority opinion) (citations omitted).

Here we consider a private search made of a container of a different sort, though one equally protected by the Fourth Amendment. *See United States v. Ross*, 456 U.S. 798, 822–23 (1982) ("[T]he Fourth Amendment provides protection to the

owner of every container that conceals its contents from plain view." (citing *Robbins v. California*, 453 U.S. 420, 427 (1981) (plurality opinion))). Indeed, the State does not dispute that defendant's thumb drive and its digital contents were his "effects" and that he possessed a legitimate expectation of privacy in these effects prior to the search by the grandmother. At issue here is the extent of defendant's expectation of privacy in those effects following that search, specifically—whether the thumb drive, or any part of it, could continue to support a legitimate expectation of privacy.

The State contends that the nature of the thumb drive as a container is such that Ms. Jones's mere "opening" of the thumb drive frustrated defendant's reasonable expectation of privacy in the entirety of its contents, thereby permitting Detective Bailey to conduct a follow-up search of any information stored on the device. According to the State, this position is consistent with a "broader view" of the private search doctrine's permissible scope, referred to by the State as the "container approach." *See, e.g., United States v. Runyan*, 275 F.3d 449, 463–65 (5th Cir. 2001) (holding that while police could not permissibly search the defendant's floppy disks, CDs, and ZIP disks previously unopened by private searchers without having substantial certainty of the disks' contents, the private searchers' opening of other disks compromised the defendant's expectation of privacy in those closed containers and police were free to examine their contents, including any files not previously viewed by private searchers); *see also Rann v. Atchison*, 689 F.3d 832, 836–38 (7th Cir. 2012) (adopting *Runyan*'s rationale "that a search of any material on a computer

disk is valid if the private party who conducted the initial search had viewed at least one file on the disk" and if police are "substantially certain" that the disk contains contraband (citing *Runyan*, 275 F.3d at 463–65)), *cert. denied*, 568 U.S. 1030 (2012). *But see United States v. Lichtenberger*, 786 F.3d 478, 480, 488 (6th Cir. 2015) (holding that where the private searcher had "clicked on different folders" in the defendant's laptop and was unsure which files she had opened, the follow-up search was not permissible because the officer could not "proceed with 'virtual certainty' that the 'inspection of the [laptop] and its contents would not tell [him] anything more than he already had been told' " (alterations in original) (quoting *Jacobsen*, 466 U.S. at 119)). *See also United States v. Sparks*, 806 F.3d 1323, 1335–36 (11th Cir. 2015) (holding that where a private searcher viewed all of the images and one video contained in an album on the defendant's cell phone, the officer could subsequently view those images and that video, but the officer exceeded the scope of the prior search by viewing a second video in that album that had not previously been watched), *cert. denied*, 136 S. Ct. 2009, *and cert. denied*, 137 S. Ct. 34 (2016); *cf. United States v. Ackerman*, 831 F.3d 1292, 1305–06 (10th Cir. 2016) (holding that where AOL's "hash value matching" screening algorithm identified one of the attachments to the defendant's e-mail as a match for child pornography but AOL never opened the e-mail itself, a government analyst exceeded the private search by opening the e-mail and viewing the attachments because doing so "could have revealed virtually any kind of noncontraband information to the prying eye"). We

conclude that the categorical approach proffered by the State is inconsistent with *Jacobsen*, which contemplates that a follow-up search will "enable[ ] [an officer] to learn nothing that had not previously been learned during the private search," 466 U.S. at 120, and which requires that a "container . . . no longer support *any* expectation of privacy," *id.* at 120 n.17 (emphasis added).

We cannot agree that the mere opening of a thumb drive and the viewing of as little as one file automatically renders the entirety of the device's contents "now nonprivate information" no longer afforded any protection by the Fourth Amendment. *Id.* at 117. An individual's privacy interest in his or her effects is not a liquid that, taking the shape of its container, wholly evaporates merely upon the container's opening, with no regard for the nature of the effects concealed therein. This is particularly true in the context of digital storage devices, which can retain massive amounts[2] of various types of information and which organize this information essentially by means of containers within containers. *See, e.g.*, Orin S. Kerr, *Searches and Seizures in A Digital World*, 119 Harv. L. Rev. 531, 555 (2005) (stating that "[a]

---

[2] For instance, Detective Bailey stated in his sworn affidavit for the search warrant that the thumb drive here had a capacity of two gigabytes and that "[o]ne gigabyte, or approximately one thousand (1,000) megabytes, is the approximate equivalent of five hundred thousand (500,000) double spaced pages of text and is estimated to be approximately two hundred and twelve (212) feet thick of paper." We mention this by way of illustration. The trial court did not make a finding on the capacity of the thumb drive, and its actual capacity is not relevant to our analysis of whether Bailey's follow-up search was permissible, which focuses on what Bailey knew (or, in this case, did not know) about the nature and extent of the private search before conducting his follow-up search.

computer is like a container that stores thousands of individual containers"). Unlike rifling through the contents of a cardboard box, a foray into one folder of a digital storage device will often expose nothing about the nature or the amount of digital information that is, or may be, stored elsewhere in the device. As the Court of Appeals majority recognized, "[d]ata stored on a thumb drive may be concealed among an unpredictable number of closed digital file folders, which may be further concealed within unpredictable layers of nested subfolders. A thumb drive search . . . may require navigating through numerous closed file folders and subfolders." *Terrell*, 810 S.E.2d at 728 (majority opinion).[3] Following the mere opening of a thumb drive by a private individual, an officer cannot proceed with "virtual certainty that nothing else of significance" is in the device "and that a manual inspection of the [thumb drive] and its contents would not tell him anything more than he already had been told." *Jacobsen*, 466 U.S. at 119. Rather, there remains the potential for officers to learn any number and all manner of things "that had not previously been learned during the private search." *Id.* at 120. Accordingly, the extent to which an individual's

---

[3] The State argues that the Court of Appeals majority reached its decision in erroneous reliance on *Riley v. California*, a case addressing the "search incident to arrest" exception to the warrant requirement, as opposed to the private-search doctrine. 134 S. Ct. 2473. We conclude that the Court of Appeals recognized the different exceptions to the warrant requirement at issue in *Riley* and in this case and did not err in looking for guidance to the Court's discussion of electronic data in *Riley*. *See Terrell*, 810 S.E.2d at 729 ("While this is a private-search exception case, not a search-incident-to-arrest exception case, *Riley*'s guidance that the nature of an electronic device greatly increases privacy implications holds just as true . . . .").

expectation of privacy in the contents of an electronic storage device is frustrated depends upon the extent of the private search and the nature of the device and its contents.

In that regard, the trial court erred in concluding that Jones's "viewing of the purple flash drive effectively frustrated Defendant's expectation of privacy as to the contents of the purple flash drive," because this conclusion is not supported by its findings of fact. The trial court's findings do not establish the precise scope of Ms. Jones's search of the thumb drive and whether Detective Bailey possessed "virtual certainty that nothing else of significance was in the [thumb drive] and that a manual inspection of the [thumb drive] and its contents would not tell him anything more than he already had been told." *Id.* at 119. Nor could the trial court have made such findings, as it is clear that the State failed to carry its burden of presenting competent evidence establishing that Bailey's warrantless search was permissible under the private-search doctrine.

At the suppression hearing, neither Ms. Jones nor Detective Bailey "testified to the exact folder pathway they followed to arrive at the" image of Sandy, "identified which folders or subfolders they opened or reviewed, [or] identified which subfolder of images they scrolled through to arrive at the" image of Sandy. *Terrell*, 810 S.E.2d at 725. Further, Ms. Jones's search of the thumb drive for images of defendant's housekeeper was far from exhaustive. While Ms. Jones clicked through "folders and sub-folders" before finding the image of Sandy, she was not aware that any of "the

folders had a title. It was just a thumb -- it's the title of the thumbdrive, purple rain." Ms. Jones thought that "the pictures were all in one folder and then the other folders were like movies." After viewing several non-incriminating images, Ms. Jones ceased her search upon finding the image of Sandy. Ms. Jones did not view any of the incriminating photos that were later discovered by Detective Bailey in an entirely separate folder.[4] Had Bailey possessed virtual certainty of the device's contents, presumably he would not have been "scrolling through . . . a lot of photos" in different folders before, according to him, he "finally happened upon the photograph with the granddaughter." It is clear that Ms. Jones's limited search did not frustrate defendant's legitimate expectation of privacy in the *entire* contents of his thumb drive and that Detective Bailey's follow-up search to locate the image of Sandy was not permissible under *Jacobsen* because he did not possess "a virtual certainty that nothing else of significance was in the [thumb drive] and that a manual inspection of the [thumb drive] and its contents would not tell him anything more than he already had been told" by Jones. *Jacobsen*, 466 U.S. at 119; *see also id.* at 120 n.17 ("A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant." (citations omitted)).

The State contends that requiring "virtual certainty" under *Jacobsen* confuses

---

[4] The fact that Detective Bailey, but not Ms. Jones, observed these incriminating photos demonstrates that the record would not support any finding that Detective Bailey simply retraced the private search undertaken by Ms. Jones, particularly given that the incriminating photos other than the one of Sandy were contained in a separate folder.

a *sufficient* condition with a *necessary* condition and that an officer can proceed with a follow-up search so long as he acts reasonably in replicating the private search based on the information conveyed to him. *See, e.g.*, *Terrell*, 810 S.E.2d at 739–40 (Stroud, J., concurring in part and dissenting in part) ("Detective Bailey sought to replicate Ms. Jones's private search but since she did not understand the organization of the drive, he could not go directly to the particular image he was seeking. . . . Detective Bailey limited his search to a reasonable effort to find exactly what Ms. Bailey reported . . . . [T]he majority's analysis wrongly requires perfection from a private searcher who reports finding contraband and a law enforcement officer who seeks to confirm existence of contraband as reported by a private searcher."). Yet, the requirement that an officer possess "virtual certainty that nothing else of significance" is in a container is central to *Jacobsen* because the private-search doctrine, unlike other exceptions to the Fourth Amendment's warrant requirement, is premised fundamentally on the notion that the follow-up search is not a "search" at all.[5] *Jacobsen*, 466 U.S. at 120 ("It infringed no legitimate expectation of privacy and hence was not a 'search' within the meaning of the Fourth Amendment."). If a container continues to support a reasonable expectation of privacy, it is a necessary

---

[5] This is true at least under the "*Katz* reasonable-expectation-of-privacy test" for a search, which the Supreme Court explained "has been added to, not substituted for, the common-law trespassory test." *United States v. Jones*, 565 U.S. 400, 409 (2012) (emphases omitted); *see id.* at 404 (stating that the government conducts a search when it "physically occupie[s] private property for the purpose of obtaining information"). The Court in *Jacobsen* did not address the trepassory test and, given our holding, we need not address defendant's argument that the private-search doctrine cannot survive in light of *Jones*.

corollary that an officer cannot proceed with a "search" of that container absent virtual certainty that he will not infringe upon that expectation of privacy.[6] *Id.* at 120 n.17 ("A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant." (citations omitted)).

Additionally, the State argues that this result will discourage private parties from coming forward with evidence of criminal activity and echoes the concern of the dissenting judge below of "plac[ing] law enforcement officers in a Catch 22 of being unable to confirm the private searcher's report without a search warrant because of the risk of accidental discovery of an image other than the one reported but being unable to get a search warrant without confirming the report." *Terrell*, 810 S.E.2d at 740. Assuming *arguendo* that it is true, as the State contends, that Detective Bailey possessed *virtual certainty* that the thumb drive contained contraband, it is unclear why such certainty would not translate into an affidavit sufficient to establish probable cause. *See State v. Riggs*, 328 N.C. 213, 219, 400 S.E.2d 429, 433 (1991) ("[P]robable cause requires only a *probability or substantial chance* of criminal activity, not an actual showing of such activity." (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)) (emphasis assed)); *State v. Arrington*, 311 N.C. 633, 638, 319 S.E.2d 254, 257–58 (1984) ("The task of the issuing magistrate

---

[6] For that reason, assuming the existence of the necessary "virtual certainty," flash drives can be the subject of a warrantless search performed pursuant to the private search doctrine.

is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (quoting *Gates*, 462 U.S. at 238)).

Finally, the State argues in the alternative that the Court of Appeals changed the private-search doctrine test by declining to follow its prior decisions and erred in not remanding for additional findings on virtual certainty and the scope of the private search. We are not persuaded that the Court of Appeals majority altered the private-search doctrine in this State,[7] which is controlled by *Jacobsen*, and for the reasons stated above we agree with the Court of Appeals majority that the evidence and findings make clear "that Detective Bailey's search was not authorized under the private-search doctrine because he did not conduct his search with the requisite level of 'virtual certainty' contemplated by *Jacobsen*." *Terrell*, 810 S.E.2d at 735 (majority opinion).

For the reasons stated herein, we affirm the decision of the Court of Appeals.[8]

---

[7] The State contends that the decision in *Robinson*, 187 N.C. App. at 798, 653 S.E.2d at 892 (holding that police could search a single videotape "more thoroughly" than the private searcher), was controlling, stating that "[a] videotape is simply the thumb drive of an earlier time." The more obvious parallel to a videotape would be a single video file, which is not what we have before us in this case.

[8] Neither party sought review of the decision of the Court of Appeals majority to "remand this matter to the trial court to determine, in the first instance, whether probable cause existed to issue the search warrant after excising from Detective Bailey's warrant

AFFIRMED.

Justice DAVIS did not participate in the consideration or decision of this case.

---

application the tainted evidence arising from his unlawful search." *Terrell*, 810 S.E.2d at 735. For that reason, that decision remains undisturbed and we express no opinion concerning its correctness.

Justice NEWBY dissenting.

In this case we apply the private-search doctrine to an electronic storage device, a thumb drive.[1] The majority holds that the private-search doctrine cannot apply to a thumb drive because, even though some of the thumb drive has been previously opened, "an officer cannot proceed with 'virtual certainty that nothing else of significance' is in the device," citing *United States v. Jacobsen*, 466 U.S. 109, 119, 104 S Ct. 1652, 1659, 80 L. Ed. 2d 85, 98 (1984). The majority argues the "virtual certainty" language in *Jacobsen* compels its holding. This rigid approach, however, is a significant misapplication of that decision. Instead of "virtual certainty" that nothing else is contained in the thumb drive, the pivotal test in *Jacobsen* requires identifying the private search and evaluating "the degree to which [the additional invasion of defendant's privacy by the government] exceeded the scope of the private search." *Id.* at 115, 104 S. Ct. at 1657, 80 L. Ed. 2d at 95. *Jacobsen* clearly states "[t]he Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id.* at 117, 104 S. Ct. at 1658–59, 80 L. Ed. 2d at 97.

The private-search doctrine is an exception to the Fourth Amendment warrant requirement for a governmental search because a search conducted with the

---

[1] A thumb drive is a small, usually rectangular device used for storing electronic data. The data is typically contained in individual files (e.g., a photograph, a document, a song, etc.), and the files are usually organized in folders and subfolders. *See Merriam-Webster's Collegiate Dictionary* 485 (11th ed. 2007) (defining a "folder" as "an organizational element of a computer operating system used to group files or other folders together").

permission of a private person does not implicate a governmental intrusion; the private person's prior search frustrates any reasonable expectation of privacy. Here a concerned grandmother searched defendant's thumb drive in her home and found a picture of her sleeping, partially nude nine-year-old granddaughter. She then delivered the thumb drive to law enforcement, intending that they verify her finding and pursue criminal charges. Law enforcement did so. This transaction constitutes a textbook application of the private-search doctrine.

There is no dispute, as the trial court found, that the grandmother opened the thumb drive, opened the folder "Bad stuff," and saw various files. Likewise, there is no dispute that the grandmother opened the subfolder "red bone" and its file containing the image of her granddaughter. The only question should be whether the detective's opening of another subfolder, while trying to replicate the grandmother search, unlawfully exceeded the scope of that private search.

The majority holds that the private-search doctrine does not apply to an electronic storage device if the private searcher did not open all of the device's folders, subfolders, and files. It maintains the test is "whether the thumb drive, or any part of it, could continue to support a legitimate expectation of privacy." In other words, if the private searcher did not open every file, there is a possibility defendant's reasonable expectation of privacy to any unopened file has not been frustrated by the private search. Therefore, by simply opening the thumb drive, law enforcement committed an unlawful search. Even though it is indisputable that the grandmother

opened the file containing the granddaughter's image, because the thumb drive contained files not searched by her, law enforcement cannot open it. In addition, to reach its result, the majority violates the standard of review by rejecting facts found by the trial court, which are supported by substantial evidence, and substitutes its own fact-finding.

The trial court took the correct approach. That court found the detective only searched the folder ("Bad stuff") identified by the grandmother. The detective stopped his search when he found the image of the granddaughter. The trial court applied *Jacobsen* as informed by panels of the Fifth and Seventh Circuits, which analyzed facts similar to those presented here and asked the correct question: Did the governmental agent attempt to limit the scope of the search to that described by the private party? The trial court found that the search "did not exceed the scope of the private, prior search done by [the grandmother], but could have been more thorough" and ultimately denied defendant's motion to suppress. Because the trial court correctly applied the private-search doctrine, its decision should be affirmed. The majority's "virtual certainty" test needlessly eliminates the private-search doctrine for electronic storage devices, making it impossible for law enforcement to verify provided information. I respectfully dissent.

## I. Facts

Jessica Jones,[2] the grandmother, located in her home and looked through a purple thumb drive (titled "Purple Rain") that belonged to her longtime boyfriend, defendant. She found an unlawful, disturbing photo of her granddaughter. She and her daughter brought the thumb drive to the Sheriff's Office and reported to Detective Hernandez that it contained, along with other images, her granddaughter's image. In laymen's terms, Jones explained her search process. Detective Hernandez completed a "Property/Evidence Status Form" that included a short summary of her conversation with Jones: "9 y/r victim's mom . . . [and Jones] Brought USB that has photographs of 9 y/r shirtless and asleep. Labeled under 'Bad stuff.' " The next morning, Detective Bailey reviewed Detective Hernandez's report and met with Jones to discuss "the visual representations she had discovered on the purple flash drive" before examining the thumb drive to verify Jones's report.[3]

In retracing Jones's search through the folder entitled "Bad stuff" and its

---

[2] This name is a pseudonym used by the trial court and the Court of Appeals.

[3] At the suppression hearing, Jones described her search of the purple thumb drive, saying "when I opened it and the images came up. . . . I saw images of adult women and what I presumed was children, but they were not inappropriate, meaning that they were clothed. They just looked like little young girls." She viewed images of adult females, some naked and some clothed. Jones noted that "the pictures were all in one folder, and she "scrolled down" by "go[ing] into folders and sub-folders." Jones then discovered her granddaughter's image "in bed and she was asleep and she's exposed from the waist up." Jones explained that she "got upset" because she "never in a million years expected to find anything like that" and then ended her search. Detective Bailey testified at the suppression hearing that, while retracing Jones's search, he "observed other young females, prepubescent females, unclothed, also some that were clothed," but when he was able "to verify what [Jones] told [him] she had seen on the flashdrive . . . . [he] completed [his] search." Thus, Detective Bailey discovered

subfolders, while looking for and before finding the granddaughter's image, Bailey discovered "fully nude photographs of an unknown child standing beside and [sic] adult female in various sexual positions" that Jones had neither observed nor reported. Detective Bailey only searched the folder identified by Jones, "Bad stuff." The "Bad stuff" subfolder titled "red bone" contained the image of the granddaughter; the "Bad stuff" subfolder titled "Cabaniia" contained the two images of the unidentified nude children viewed by Detective Bailey. Detective Bailey sought and obtained a search warrant to forensically examine the thumb drive for any hidden files. Upon executing the warrant, a SBI technician extracted ten additional images of child pornography, which had previously been deleted from the subfolder titled "Cabaniia." Defendant faced charges for the photograph of the granddaughter as well as for possessing the two images of the children as observed by Detective Bailey and the ten images discovered by the SBI technician.

Defendant moved to suppress all evidence obtained by and through Detective Bailey upon his viewing of the thumb drive Jones brought to the police. During the suppression hearing, defense counsel identified the issue as, *inter alia*, "to what extent did Detective Bailey's subsequent search without a search warrant exceed the scope of the search done by the private citizen." Counsel argued that, because Detective Bailey discovered "entirely different type images," his action "without a search warrant clearly exceeds the scope of the search done by a private individual,

---

the two images of child pornography before finding the granddaughter's image.

in this case, [Jones]." Because Detective Bailey happened upon the additional images while retracing Jones's search for the granddaughter's image, defendant argued those images could not serve as a basis for probable cause for the warrant.

Following a hearing on the motion to suppress, the trial court made its ruling:

> I've read through the case law handed up, read the case law in North Carolina, it appears to me that this -- in exercising my discretion, it appears that there was a private party who went into this flashdrive and, by doing so, I believe the Court says it frustrated the defendant's reasonable expectation of privacy as to the contents of that flashdrive.
>
> Therefore, thereafter, when the police officer went into that same thumbdrive . . . to confirm what has been stated to him, he found additional matters and he did so in a manner that was, perhaps, more thoroughly than the initial examination by [Jones]. He ran into more images than what [Jones] ran into.
>
> Given all of this, in exercising my discretion, the motion to suppress will be denied.

The trial court's written order included findings regarding the relationship between defendant and Jones and a description of the private search conducted here:

> 2. On January 13, 2014, [Jones] was in her home; defendant was not present. [Jones] looked inside of a briefcase belonging to the defendant, which stayed in her home in a usual and customary manner. On this date, defendant's briefcase was in [Jones's] den. Inside the briefcase, [Jones] found, among other items, a USB flash drive, sometimes referred to as a thumb drive. The flash drive in issue here was purple in color. [Jones's] stated purpose for looking in defendant's briefcase was to put a face to someone that defendant had talked about. [Jones's] entry into defendant's briefcase and the contents therein were solely at her own volition and not connected with or at the

suggestion of any law enforcement person or organization.

3. [Jones] inserted the purple flash drive into a shared Apple computer and discovered, among other visual representations, a picture of her granddaughter, [name redacted] who appeared to be asleep and who was nude from the waist up with breasts displayed. After consulting with her daughter, the mother of [the child], [Jones] and her daughter, on January 13, 2014, took the purple flash drive to the Onslow County Sheriff's Department.

Next, the trial court made findings regarding Jones's delivery of the purple flash drive to law enforcement.

4. On January 13, 2014, [Jones] met with Detective Lucinda Hernandez to discuss what she had found on the purple flash drive. Detective Hernandez accepted the purple flash drive and logged it into the Crime Scene Investigation (CSI) Unit of the Onslow County Sheriff's Department. Detective Hernandez did not view the purple flash drive.

5. On January 14, 2014, [Jones] again appeared at the Onslow County Sheriff's Department to meet with Detective Eric Bailey concerning the purple flash drive and the contents that she had seen on that flash drive. Detective Bailey discussed with [Jones] the visual representations she had discovered on the purple flash drive.

The trial court found that law enforcement retraced Jones's private search through the folder identified by Jones as containing the granddaughter's image and saw additional incriminating and corroborating photographs. Ultimately, Detective Bailey confirmed what Jones told him about the thumb drive:

6. Following his discussion with [Jones], Detective Bailey

7

went to the CSI Unit to confirm on the purple flash drive what he had been told by [Jones]. Detective Bailey did not remove the purple flash drive from the CSI Unit where it was being held securely as a matter of evidence. The CSI technician placed the purple flash drive into CSI's computer *and selected the folder* [*Bad stuff*] *that has been identified by* [*Jones*] *as containing the picture of her granddaughter* [name redacted]. This viewing in the CSI Unit confirmed what [Jones] had told Detective Bailey that she had discovered on the flash drive. In addition to the picture of [the granddaughter] Detective Bailey saw photographs of other nude or partially nude prepubescent females posing in sexual positions.

7. The images observed by Detective Bailey corroborated the information provided to him by [Jones]. Based upon that corroboration and [Jones's] statements, Detective Bailey then obtained a search warrant in order to conduct a complete and thorough forensic examination of the purple flash drive.

(Emphasis added.) The trial court found as fact that "8. Detective Bailey's initial search and examination of the purple flash drive in the CSI Unit did not exceed the scope of the private, prior search done by [Jones], but could have been more thorough."

Having made the preceding findings, the trial court concluded the search was valid under the private-search doctrine:

2. [Jones's] viewing of the purple flash drive did not violate the Fourth Amendment because she was a private party . . . . Her viewing of the purple flash drive effectively frustrated Defendant's expectation of privacy as to the contents of the purple flash drive, and thus the later viewing by Detective Bailey at her request and upon presentation of the flash drive to [law enforcement] did not violate Defendant's rights under

8

the Fourth Amendment.

> 3. None of the Defendant's [constitutional] rights . . . were violated during the seizure and search of the purple flash drive in this case.

The trial court thus denied defendant's motion to suppress, and the State introduced into evidence thirteen images all retrieved from the "Bad stuff" folder. Regarding the granddaughter's image, the jury convicted defendant of one count of possessing a photographic image from peeping and one count of second-degree sexual exploitation of a minor. The jury also convicted defendant of twelve counts of third-degree sexual exploitation of a minor based on the twelve other images. Defendant appealed.

In a divided opinion, the Court of Appeals first determined that the private-search doctrine did not apply to Detective Bailey's search because the thumb drive was not a "single container" and there was not "virtual certainty" that the thumb drive contained only contraband or material reported by Jones. *State v. Terrell*, 810 S.E.2d 719, 726 (N.C. Ct. App. 2018). The Court of Appeals acknowledged that the private-search doctrine would typically require factual findings as to the specific scope of Jones's and Bailey's searches, *id.* at 734, like those made by the trial court here. But, because Jones did not report the exact file path for the granddaughter's image, Bailey could not be virtually certain that he would find nothing else of significance during his search. *Id.* After concluding that "*Jacobsen*'s virtual-certainty requirement was not satisfied," the Court of Appeals opined that "the precise scope of both searches [was] immaterial," *id.* at 732; therefore, the court

did not remand for further factual findings on that issue, *id.* at 735. The Court of Appeals did, however, remand for a determination of whether the search warrant application would still supply "probable cause to issue the search warrant to forensically examine the thumb drive." *Id.* at 736.

The dissent maintained that the scope of the subsequent search was not only material but determinative of the legal issue here. *Id.* at 740 (Stroud, J., concurring in part and dissenting in part). Even though the dissent did not view the thumb drive as a "single container" now fully opened by Jones's private search, the search did not violate the Fourth Amendment because Detective Bailey limited his search to efforts to find an image he was substantially certain was on the thumb drive and stopped his search when he found it. *Id.* at 739. Thus, "[e]ven if all of the other images are excluded from consideration, the granddaughter's image along with the other information in the warrant application and affidavit could support a finding of probable cause to issue the search warrant." *Id.* at 738.

## II. Issue Presented

At this Court, the majority now affirms the Court of Appeals's "virtual certainty" approach. This unrealistic standard essentially holds the private-search doctrine cannot be applied here because, with electronic storage devices, there is never a "virtual certainty" that a government searcher will not discover other unopened material. To reach this sweeping conclusion, the majority misapplies *Jacobsen*, ignores the precise facts leading to the discovery of the different photos,

blurs the distinction between electronic storage devices and electronic computer-type devices, and refuses to follow the accepted standard of review by substituting its own findings of fact. It holds that the private-search doctrine does not apply if "the thumb drive, or any part of it, could continue to support a legitimate expectation of privacy." According to the majority, whether the governmental search included a privately opened file is immaterial as long as other unopened files exist.

The correct question, however, is what files and folders were opened, not whether some remained unopened. The Court should ask to what extent Detective Bailey's subsequent search without a search warrant exceeded the scope of the private search. The trial court seems to say that, by having opened the purple thumb drive, defendant's expectation of privacy was thwarted as to all of its files. This broad application, however, is unnecessary to resolve the precise issue presented by this case. There is no evidence that Detective Bailey looked in any folder other than the one identified by Jones as labeled "Bad stuff." Thus, this case presents the issue of whether defendant's reasonable expectation of privacy was lost as to some, or all, of the files contained in the folder "Bad stuff" previously opened and reviewed by Jones. Each of the three separate groups of images, all located in the folder "Bad stuff," require an analysis under the private-search doctrine:

1) the granddaughter's image, located in the subfolder "red bone," which was clearly opened by Jones and Detective Bailey;

2) the unidentified nude children, discovered by Detective Bailey in the subfolder "Cabaniia," while attempting to retrace Jones's search, but before finding the granddaughter's image; and

3) the ten images located in the subfolder "Cabaniia" discovered by the SBI technician pursuant to the search warrant.

The correct approach of *Jacobsen* requires identifying the initial private search and evaluating "the degree to which [the additional invasion of defendant's privacy] exceeded the scope of the private search." *Jacobsen*, 466 U.S. at 115, 104 S. Ct. at 1657, 80 L. Ed. 2d at 95.

### III. Proper Appellate Review of the Trial Court Order

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. . . . Conclusions of law are reviewed de novo and are subject to full review." *State v. Biber*, 365 N.C. 162, 167–68, 712 S.E.2d 874, 878 (2011) (citations omitted). Here the trial court order meets this standard. Competent evidence supports the trial court's findings of fact, and those findings of fact support its conclusions of law and its ultimate denial of defendant's motion to suppress. Most significantly, the trial court made the following findings of fact which are supported by the evidence:

> 6. . . . . The CSI technician placed the purple flash drive into CSI's computer *and selected the folder that has been identified by [Jones] as containing the picture of her granddaughter* [name redacted]. This viewing in the CSI

12

Unit confirmed what [Jones] had told Detective Bailey that she had discovered on the flash drive. In addition to the picture of [the granddaughter] Detective Bailey saw photographs of other nude or partially nude prepubescent females posing in sexual positions.

. . . .

8. Detective Bailey's initial search and examination of the purple flash drive in the CSI Unit did not exceed the scope of the private, prior search done by [Jones], but could have been more thorough.

(Emphasis added.) Based on these findings, the trial court concluded:

2. . . . . [Jones's] viewing of the purple flash drive effectively frustrated Defendant's expectation of privacy as to the contents of the purple flash drive, and thus the later viewing by Detective Bailey at her request and upon presentation of the flash drive to [law enforcement] did not violate Defendant's rights under the Fourth Amendment.

IV. Law & Analogous Cases

The Fourth Amendment, applied to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. Nonetheless,

[l]ong-established precedent holds that the Fourth Amendment does not apply to private searches. *See Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S. Ct. 574, 65 L. Ed. 1048 (1921). When a private party provides police with evidence obtained in the course of a private search, the police need not "stop her or avert their eyes." *Coolidge v. New Hampshire*, 403 U.S. 443, 489, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). Rather, the question becomes whether the police subsequently exceed the scope of the private search. *See United States v. Jacobsen*, 466 U.S. 109, 104 S.

13

Ct. 1652, 80 L. Ed. 2d 85 (1984).

*Rann v. Atchison*, 689 F.3d 832, 836 (7th Cir. 2012). "The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *Jacobsen*, 466 U.S. at 115, 104 S. Ct. at 1657, 80 L. Ed. 2d at 95.

In *Jacobsen* employees of a private shipping carrier notified federal Drug Enforcement Administration (DEA) agents that they had opened a damaged package in accord with company policy, cut open a tube inside the package, and discovered a white powdery substance in the innermost of a series of four plastic bags that had been concealed therein. *Id.* at 111, 104 S. Ct. at 1655, 80 L. Ed. 2d at 92–93. The employees of the private shipping carrier reassembled the package, replacing the plastic bags in the tube and returning the tube back to the cardboard box. *Id.* at 111, 104 S. Ct. at 1655, 80 L. Ed. 2d at 93. When the first federal agent arrived, he retraced the private search, removing the tube from the box and the plastic bags from the tube, and observed the white powdery substance. *Id.* at 111–12, 104 S. Ct. at 1655, 80 L. Ed. 2d at 93. The agent then continued the search, opening all the bags and removing a trace of the powder for chemical testing. *Id.* at 111, 104 S. Ct. at 1655, 80 L. Ed. 2d at 92. The field chemical tests revealed the substance was cocaine, and federal agents obtained and executed a warrant to search the location to which the package was addressed. *Id.* at 111–12, 104 S. Ct. at 1655, 80 L. Ed. 2d at 93.

The Court in *Jacobsen* first set out the Fourth Amendment protections against

14

unreasonable searches and seizures, defining an impermissible search as "occur[ring] when there is some meaningful interference with an individual's possessory interests in that property" if that interference is unreasonable and conducted by the government. *Id.* at 113, 104 S. Ct. at 1656, 80 L. Ed. 2d at 94. Thus, the protection "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *Id.* at 113–14, 104 S. Ct. at 1656, 80 L. Ed. 2d at 94 (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S. Ct. 2395, 2404, 65 L. Ed. 2d 410, 421 (1980) (Blackmun, J., dissenting)).

Regardless of "[w]hether those [employees'] invasions [of respondents' package] were accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character." *Id.* at 115, 104 S. Ct. at 1657, 80 L. Ed. 2d at 95 (footnote omitted); *see id.* at 117, 104 S. Ct. at 1658, 80 L. Ed. 2d at 96 ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities . . . ." (quoting *United States v. Miller*, 425 U.S. 435, 443, 96 S. Ct. 1619, 1624, 48 L. Ed. 2d 71, 79 (1976))). "Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information . . . ." *Id.* at 117, 104 S. Ct. at 1658, 80 L. Ed. 2d at 96. The Court identified the standard by which to assess the subsequent government action: "The additional invasions of respondents' privacy by the [DEA]

15

agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115, 104 S. Ct. at 1657, 80 L. Ed. 2d at 95 (citing *Walter*, 447 U.S. 649, 100 S. Ct. 2395, 65 L. Ed. 2d 410). Notably, *Jacobsen* did not involve the search of a digital storage device but rather "an ordinary cardboard box." *Id.* at 111, 104 S. Ct. at 1655, 80 L. Ed. 2d at 93. The Court noted that it was indisputable that the government could use the employees' testimony about what they observed when they opened the package.

> If that is the case, it hardly infringed respondents' privacy for the agents to reexamine the contents of the open package by brushing aside a crumpled newspaper and picking up the tube. The advantage the Government gained thereby was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing respondents' privacy. Protecting the risk of misdescription hardly enhances any legitimate privacy interest, and is not protected by the Fourth Amendment.

*Id.* at 118–19, 104 S. Ct. at 1659, 80 L. Ed. 2d at 97–98.

The Fifth Circuit in *United States v. Runyan,* 275 F.3d 449 (5th Cir. 2001), applied *Jacobsen* in the context of a private search of digital storage devices similar to the thumb drive at issue here. In that case Runyan was convicted on child pornography charges after his former wife and several of her friends collected various digital media storage devices from his home and turned them over to the police. *Id.* at 453, 455. The Fifth Circuit analogized digital media storage devices to physical containers. That court determined that "police exceed the scope of a prior private search when they examine a closed container that was not opened by the private

searchers unless the police are already substantially certain of what is inside that container based on the statements of the private searchers, their replication of the private search, and their expertise." *Id.* at 463. Thus, even an unopened container may fall within the scope of the private search if a "defendant's expectation of privacy in the contents of the container has already been frustrated because the contents were rendered obvious by the private search." *Id.* at 463–64 (noting that "this rule discourages police from going on 'fishing expeditions' by opening closed containers").

Because the police could be substantially certain, based on conversations with Runyan's former wife and her friends, about the contents of the privately searched disks, police did not exceed the scope of the private search when they searched those specific disks, even if they searched the same disks more thoroughly. *Id.* at 465. The police only exceeded the scope of the private search when they searched *different* disks, those that Runyan's former wife and her friends had not previously "opened" or, in other words, viewed at least one file therein. *Id.* at 463–64.

Similarly, the Seventh Circuit in *Rann* considered the merits of "whether the police's viewing of [certain images stored on digital devices] constituted a significant expansion of a private search such that a warrant was required to permit police to view the images," *Rann*, 689 F.3d at 835, and applied *Runyan* to similar facts:

> S.R. testified that she knew [the defendant] Rann had taken pornographic pictures of her and brought the police a memory card that contained those pictures. S.R.'s mother also brought the police a zip drive containing pornographic pictures of her daughter. Both women brought evidence supporting S.R.'s allegations to the police; it is entirely

17

> reasonable to conclude that they knew that the digital media devices contained that evidence. The contrary conclusion—that S.R. and her mother brought digital media devices to the police that they knew had no relevance to S.R.'s allegations—defies logic.

*Id.* at 838; *see id.* at 837–38 (Given the lower court's assessment that, because S.R. "turned exactly one memory card over to the police, and her mother gave the police exactly one zip drive," the appellate court stated that it could not "imagine more conclusive evidence that S.R. and her mother knew exactly what the memory card and the zip drive contained."). Accordingly, "even if the police more thoroughly searched the digital media devices . . . *and viewed images that* [*the prior search*] . . . *had not viewed*," the police search did not exceed the scope of the prior search because "the police were 'substantially certain' the devices contained child pornography" as alleged by the private searchers. *Id.* at 838 (emphasis added) (applying *Runyan*, 275 F.3d at 463).

Thus, in the digital storage context, the question remains "whether the police subsequently exceed the scope of the private search." *Id.* at 836 (citing *Jacobsen*, 466 U.S. at 109, 104 S. Ct. at 1652, 80 L. Ed. 2d at 85); *accord Runyan*, 275 F.3d at 463–64. When the police are substantially certain the devices contain the contraband as alleged by the private searchers, police do not exceed the scope of the private search when they examine the same materials more thoroughly or when they search additional items within the same container previously opened by a private party. *Rann*, 689 F.3d at 838; *Runyan*, 275 F.3d at 461–63.

18

*Newby, J., dissenting*

V. Analysis

The analysis the Fifth and Seventh Circuits apply is correct. Using the container analogy as instructed by *Runyan* and *Rann*, defendant left in Jones's home a digital "box of folders" that she could open and examine. When she did so, defendant's expectation of privacy became frustrated; she had possession of and gained access to the entire contents of the thumb drive. Its contents, specifically, various photos of defendant with adult females and the image of her nine-year-old partially nude granddaughter located in the "Bad stuff" folder, became obvious to Jones, the private searcher.

When she turned over the thumb drive to law enforcement, she did so without limitation and authorized them to look for her granddaughter's image. Nonetheless, she gave a layman's description of her search process and identified the location of her granddaughter's image as "[l]abled under 'Bad stuff.'" Thereafter, police in good faith attempted to replicate the grandmother's search.

Detective Bailey's follow-up search to verify Jones's discovery can be a more thorough review of the same privately searched materials or can uncover more items from the same container Jones previously opened. *See Runyan*, 275 F.3d at 464–65. Like in *Runyan* and *Rann*, even if Jones did not open every picture file it contained, Detective Bailey could be substantially certain, based on conversations with her, what the privately searched thumb drive contained. As found by the trial court, he did not exceed the scope of the private search when he searched the one and only

19

thumb drive he received and confined that search within the "Bad stuff" folder as identified by Jones, even if Detective Bailey's search was more thorough than Jones's search. *Runyan*, 275 F.3d at 465.

In addressing each group of images separately, it is clear that none should be suppressed. When Jones opened the purple thumb drive, she went to the folder labeled "Bad stuff." Though she could not recall the names of the subfolders that contained the images she saw, she found her granddaughter's image in one of these subfolders (ultimately identified as "red bone"). Clearly, Jones's search thwarted defendant's reasonable expectation of privacy as to that subfolder, and the private-search doctrine allowed the detective to enter that subfolder. Entering the "Bad stuff" folder and the "red bone" subfolder mirrored the precise scope of the private search. "The agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." *Jacobsen*, 466 U.S. at 119–20, 104 S. Ct. at 1660, 80 L. Ed. 2d at 98 (citing *Coolidge*, 403 U.S. at 487–90, 91 S. Ct. at 2048–50, 29 L. Ed. 2d at 595–96; *Burdeau*, 256 U.S. at 475–76, 41 S. Ct. at 576, 65 L. Ed. at 1051).

As Detective Bailey tried to replicate Jones's search, he entered a subfolder in "Bad stuff" titled "Cabaniia," within which he found the photos of the unidentified nude children. It is unclear if Jones actually opened the "Cabaniia" subfolder. In evaluating Detective Bailey's search, the question is "the degree to which [he] exceeded the scope of the private search." *Jacobsen*, 466 U.S. at 115, 104 S. Ct. at

1657, 80 L. Ed. 2d at 95. By entering the folder "Bad stuff," Jones frustrated defendant's reasonable expectation of privacy as to any file it contained. The trial court found that in discovering the two additional photos depicting child pornography, Detective Bailey's search "did not exceed the scope of the private, prior search done by [Jones], but could have been more thorough." A more thorough search does not remove the search from the private-search doctrine. A forensic search, authorized by a search warrant substantiated by Jones's statements to Detective Bailey, revealed the final ten photos.

The majority holds that there can be no lawful governmental search under the private search doctrine as long as "the thumb drive, or any part of it, could continue to support a legitimate expectation of privacy." Thus, it refuses to address the precise steps taken by Detective Bailey to replicate the search done by Jones or to address each category of evidence separately. It does not even mention that the search was limited to the "Bad stuff" folder. It finds this approach unnecessary as it concludes there must be "virtual certainty" the thumb drive contains nothing else besides the illegal photo. Regardless of whether Jones opened the purple thumb drive and the folder "Bad stuff," unless she also testified she opened each of the other folders and files and reviewed their contents, the majority concludes the private-search doctrine is inapplicable, even as to the precise photo identified by Jones.

The majority wrongly asks whether any folders or files in the thumb drive were unopened by Jones. By its approach, if any of the subfolders or files remained

unopened, then Detective Bailey's opening of the thumb drive was an unconstitutional search because he could not be virtually certain that nothing else of significance was on the thumb drive. The majority assumes, without a factual basis, that Detective Bailey engaged in an extensive search of "the *entire* contents of" the thumb drive without any direction from Jones, opining that Detective Bailey had been " 'scrolling through . . . a lot of photos' in different folders before, according to him, he 'finally happened upon the photograph with the granddaughter.' " The trial court found facts to the contrary.

The record indicates that here the grandmother identified the one folder, within which law enforcement could locate the granddaughter's image. According to the finder of fact, Detective Bailey reported that he "selected the *folder* [*Bad stuff*] *that had been identified by* [*Jones*] as containing the picture of her granddaughter [name redacted]." (Emphasis added.) This Court does not have the thumb drive before us for inspection. Based on the facts presented to the trial court, which did have the thumb drive, however, there is no indication that Jones did not sufficiently understand the features of the thumb drive to be able to direct Detective Bailey to "the pictures [that] were all in one folder." Competent evidence presented to the trial court certainly supports the trial court's finding that Detective Bailey's efforts to verify Jones's allegations fell within the scope of her initial search. Under the majority's circular approach, law enforcement cannot conduct a subsequent search to verify the reported image within the "Bad stuff" folder—for risk of inadvertently

seeing other subfolders and files—at least not without the probable cause supplied by verifying its contents.

The analysis of the opinions of both the Court of Appeals majority and this Court are influenced by *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), in which the Supreme Court of the United States declined to extend the search-incident-to-arrest exception to police searches of digital data on cell phones. The court below determined that *Riley* "guides our decision in how best to apply a doctrine originating from the search of a container limited by physical realities to a search for digital data on an electronic storage device that is not." *Terrell*, 810 S.E.2d at 729 (majority opinion) (citations omitted). The Court of Appeals concluded that a thumb drive's "potential to hold vastly more and distinct types of private [electronic] information" renders the container analogy inapplicable for Fourth Amendment purposes. *Id.* at 728–29 (citing *Riley*, 573 U.S. at 386, 134 S. Ct. at 2485, 189 L. Ed. 2d at 442–43); *see also Riley*, 573 U.S. at 393, 134 S. Ct. at 2488–89, 189 L. Ed. 2d at 446 ("Modern cell phones . . . implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse."). *Riley* simply does not apply here. The cell phone in that case was not a finite container like the thumb drive here, whose contents had been previously viewed by a third party; therefore, the owner's expectation of privacy was not frustrated as to any aspect of the cell phone.

VI. Conclusion

23

*Newby, J., dissenting*

While computers and cell phones may conceivably open the door to seemingly unlimited mounds of information, those devices are not implicated here. The purple thumb drive was a storage device with limited space. Moreover, Detective Bailey did not engage in a "fishing expedition" but retraced Jones's search within the thumb drive's folder, "Bad stuff." Rather than remedying a constitutional violation, the majority's opinion here only frustrates concerned citizens' attempts to report criminal activity against children and prevents law enforcement from verifying the allegations.

Under our time-honored standard of review, the trial court appropriately denied the motion to suppress. It found facts supported by the evidence and correctly applied the law. Its order should be upheld. I respectfully dissent.